# EXHIBIT C

Page 1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHER DISTRICT OF NEW YORK

4   ---------------------------------------X

5   RÖBYNN EUROPE,

6                          Plaintiffs,

7        - against -

8   EQUINOX HOLDINGS, INC. d/b/a
    EQUINOX FITNESS CLUB, EQUINOX EAST

9   92nd STREET, INC., JOSE TAVERAS,
    individually, CHRISTOPHER MALTMAN,

10  individually, and ADAM GECHT,
    individually,

11

                           Defendants.

12

    CASE NO.: 20-CV-07787(JGK)

13  ---------------------------------------X

14

15              ZOOM VIDEOCONFERENCE

16

                        July 12, 2021

17                      10:09 a.m.

18

19          DEPOSITION of Plaintiff, RÖBYNN

20  EUROPE, before Melissa Gilmore, a Stenographic

21  Reporter and Notary Public of the State of New

22  York.

23

24

25  Job No. NY4700999

```
 1                    EUROPE
 2   and controlled the company's finances.
 3        Q.    Were you issued any type of written
 4   discipline by CLAY Health Club prior to your
 5   termination?
 6        A.    No.
 7        Q.    Were you issued any written
 8   discipline for any of the other positions
 9   you've described thus far?
10        A.    Only at Equinox.
11        Q.    Prior to coming to Equinox, were you
12   ever disciplined by any prior employer for time
13   and attendance issues?
14              MS. LIEDERMAN:  Objection.
15              You can answer.
16        A.    Not that I can recall.
17        Q.    Can you recall any prior supervisor
18   at a prior place of employment ever telling you
19   that you needed to improve your time and
20   attendance?
21        A.    Not that I can recall.
22        Q.    Do you recall ever struggling to get
23   to work on time at any of your prior places of
24   employment before coming to Equinox?
25        A.    Yes.
```

```
                                              Page 22
 1                   EUROPE
 2        Q.    Where was that?
 3        A.    At New York Health & Racquet Club.
 4        Q.    Was that during the first time you
 5   worked there, the second time, or both?
 6        A.    Only when I took on the management
 7   position.
 8        Q.    And what do you recall struggling
 9   with specifically?
10        A.    Typically the day began quite early,
11   which at the time I was living very far away, I
12   believe I was living in Coney Island, so it was
13   quite a trek.
14        Q.    And what happened?  I mean, did your
15   supervisor approach you about your lateness or
16   was it just something you recall happening?
17              MS. LIEDERMAN:  Objection.
18              You can answer.
19        A.    I would not say that it was lateness
20   because we didn't have a defined schedule at
21   New York Health & Racquet Club at that time,
22   but she did ask if I could come in earlier in
23   the day and I came in earlier in the day.
24        Q.    For all the other positions then
25   that you've described at other employers before
```

```
                                        Page 23
 1                   EUROPE
 2    Equinox, is it your testimony then that you
 3    left all of these jobs voluntarily?
 4         A.    Yes, as far as I recall.  It's been
 5    quite some time with the exception of the
 6    places that closed.
 7         Q.    That was the Gym in Chelsea?
 8         A.    It was in Gramercy and David Barton
 9    Gym.
10         Q.    Prior to coming to work at Equinox,
11    were you ever a member at Equinox, a client?
12         A.    No.
13              Before you ask your next question,
14    I'm just going to turn up my AC.  It's a little
15    warm.
16         Q.    No problem.
17         A.    Okay.  Thank you.
18         Q.    No problem.
19              So when did you first apply for
20    employment with Equinox?
21         A.    Oh, good question.  I believe it was
22    in the late summer of 2018.
23         Q.    How did you know about a job being
24    available at Equinox, if you did know?
25         A.    I didn't know that a job was
```

```
 1              EUROPE
 2         And the second interview with Josh
 3    and Adam took place at -- it might have been
 4    either 92nd Street.  It was certainly on the
 5    Upper East Side.
 6         Q.    What position was it that you were
 7    applying for in late summer 2018?
 8         A.    Personal training manager.
 9         Q.    And at some point in time were you
10    offered the position?
11         A.    Yes.
12         Q.    Who conveyed the offer to you?
13         A.    Michael Caporusso.
14         Q.    And at that time were you working
15    elsewhere when you were offered the position at
16    Equinox?
17         A.    No.
18         Q.    Is it fair to say your employment
19    with CLAY ended at some point after the time
20    you first applied to work with Equinox but
21    before the time you were offered a position at
22    Equinox?
23         A.    Yes.
24         Q.    Did you accept right way when you
25    were offered the position?
```

```
                                    Page 27
 1              EUROPE
 2      A.    Yes.
 3      Q.    What location were you hired to work
 4   at?
 5      A.    I was hired to be trained at
 6   East 61st Street, but at that point I was not
 7   told what location I would be ultimately
 8   transferred to.
 9      Q.    And did you start work at East 61st
10   Street?
11      A.    Again, I guess I was given a title,
12   but it was primarily training for the position.
13   I was given the title of fitness manager and I
14   assisted the personal training manager at that
15   location.
16      Q.    When did you start the training at
17   East 61st Street?
18      A.    I believe in November or October of
19   2018, but I'm not certain.  It was about a
20   month before I was moved to East 92nd Street.
21      Q.    So was that month all training,
22   orientation or were you actually working as a
23   fitness manager there?
24      A.    It was a lot of role playing.  A lot
25   of performing the duties that I would have to
```

```
                                          Page 29
  1                   EUROPE
  2        A.    No.
  3        Q.    Was there a plan all along after
  4   your training was done for you to transfer to
  5   another location?
  6             MS. LIEDERMAN:  Objection.
  7             You can answer.
  8        A.    I don't know what the plan was.  I
  9   accepted the position and agreed to perform the
 10   role that I was hired to perform until I could
 11   be transferred to a personal training manager
 12   position somewhere.
 13        Q.    Does the personal training manager
 14   always supervise the fitness manager?
 15        A.    If the fitness manager is in the
 16   role, yes.
 17        Q.    So how did it come about that you
 18   transferred from East 61st Street to East 92nd
 19   Street?
 20        A.    A couple of days before I was
 21   transferred, I was told that I was being
 22   transferred to East 92nd Street.  I came to
 23   East 92nd Street and met with the personal
 24   training manager who was already there who was
 25   being transferred to the Williamsburg club in
```

```
                                            Page 30

 1                    EUROPE
 2    Brooklyn.  And I spoke to Josh Harrison, and
 3    then I believe it was within a couple of days I
 4    was at East 92nd Street.
 5         Q.    Who was it that you told you that
 6    you're going to be transferred?
 7         A.    I don't recall if it was Josh
 8    Harrison or Michael Caporusso.
 9         Q.    And what were Josh and Michael's
10    positions at the time, if you know?
11         A.    I don't remember.  I'm sorry.
12         Q.    Were they local managers at
13    East 61st Street or do they have oversight over
14    several different clubs?
15         A.    Michael was a regional director, but
16    I'm not certain that's the exact title, but he
17    was a regional director, I believe it was for
18    the entire East Coast.
19              And Josh was -- I don't remember his
20    title, but I believe he was a director for the
21    entire Upper East Side.
22         Q.    When was the transfer effective?
23         A.    In December of 2018, as I recall.  I
24    believe it was just before Christmas.
25         Q.    Who was your supervisor after the
```

```
                                        Page 31

 1                      EUROPE

 2   transfer?

 3        A.    Jose Taveras was my direct

 4   supervisor.  So he was the person I was

 5   expected to report to on a day-to-day basis.

 6   And Josh Harrison was -- you know, looking

 7   back, it's hard to really know what the chain

 8   of command was, but Josh Harrison was also

 9   someone who I could go to about my position and

10   how to perform it.

11        Q.    What was Jose Taveras' position?

12        A.    General manager.

13        Q.    And that was general manager of

14   East 92nd Street; is that correct?

15        A.    Yes.

16        Q.    And just to confirm, what was your

17   position as of the time of the transfer to

18   East 92nd Street?

19        A.    Personal training manager.

20        Q.    And do you recall what your salary

21   was at that time?

22        A.    I do not recall.  It may have been

23   around 65,000, but I'm not a hundred percent

24   certain on that.

25        Q.    During the time you were working at
```

```
                                          Page 33
 1                    EUROPE
 2   not certain.
 3       Q.    And what was Mr. Gecht's position at
 4   the time, if you know?
 5       A.    I don't recall his title.  He was
 6   also a regional manager or director, however
 7   you want to describe it, I believe of the Upper
 8   East Side.
 9       Q.    As personal training manager at
10   East 92nd Street -- actually, withdrawn.
11            Were there other personal training
12   managers at East 92nd Street or was it just you
13   at the time you started to work there in
14   December 2018?
15       A.    It was just me.
16       Q.    And did you have direct reports?
17       A.    Chris Maltman reported to me and the
18   training staff, for the most part, reported to
19   Chris or me.
20       Q.    What was Chris Maltman's position at
21   the time?
22       A.    Fitness manager.
23       Q.    Do you know how long he had been
24   working as fitness manager at East 92nd Street
25   at the time you started?
```

```
                            EUROPE
```

1          Q.   So going back to East 92nd Street,
2     when you started working there, how many people
3     were part of the training staff that you said
4     reported to either Chris or to you?
5          A.   It may have been about 15, but I
6     don't recall the exact number.
7          Q.   And were their titles just personal
8     trainers or were there others who were part of
9     that group as well?
10         A.   Their titles were just personal
11    trainers.
12         Q.   How was it determined who reported
13    to you versus who reported to Chris?
14         A.   As the head of the department,
15    everyone reported to me ultimately.  When
16    things needed to happen it was my
17    responsibility to make sure that those things
18    happened.  So whether people were supposed to
19    report to Chris or not, it was ultimately my
20    department.
21         Q.   Did you set Mr. Maltman's schedule?
22         A.   No.
23         Q.   What was your level of oversight
24    responsibility for Mr. Maltman?

```
 1              EUROPE
 2  me if you're able to see the exhibit that I'm
 3  sharing and also -- okay.  I see that you're
 4  selecting the option to control, so you can
 5  scroll through it hopefully.
 6       A.    Okay.  I can scroll through.
 7       Q.    If you can just take a minute to
 8  scroll through and see what's in this document
 9  that has been marked as Defendants' Exhibit 1.
10       A.    (Document review.)  How far through
11  this would you like me to go?
12       Q.    I defer to you as to how closely you
13  look.  Maybe you can just scroll through kind
14  of the whole thing so you can see what's there.
15       A.    (Document review.)  Okay.  I believe
16  I am somewhat familiar with this document.
17       Q.    What do you recognize this document
18  to be?
19       A.    The employee handbook.
20       Q.    And did you receive the employee
21  handbook when you began working at Equinox?
22       A.    Yes.
23       Q.    Do you recall when you received the
24  employee handbook?
25       A.    I believe I received it as soon as I
```

Page 40

                            EUROPE

1
2     was hired.

3         Q.    And did you read the document?

4         A.    Yes.

5         Q.    Do you recall if you had any

6     questions about it?

7         A.    No.

8         Q.    And if I could just refer you to the

9     last two pages of the exhibit, there is a

10    couple of electronic receipts there on that

11    page and the page before, referring to the

12    pages that are Bates D48, which is the

13    second-to-last page, and then D55, which is --

14    I'm sorry, D49, which is the second-to-last

15    page and then D55, which is the last page.

16        A.    (Document review.)

17        Q.    And do you recall electronically or

18    digitally signing these two receipts that are

19    the last two pages of the document here?

20        A.    Yes.

21        Q.    Do you recall who provided you with

22    the employee handbook when you started working

23    at Equinox?

24        A.    No, I believe it was sent to me

25    automatically and electronically and I had to

```
 1                    EUROPE
 2   click a link to download it, but I'm not
 3   certain on that.
 4        Q.    Okay.  And it looks like both of
 5   these electronic receipts were signed on
 6   November 19, 2018.
 7             Is it correct that would be your
 8   first day, your first week of employment at the
 9   East 61st Street location?
10        A.    I believe so, but I don't recall the
11   exact date that I was hired.
12        Q.    Okay.  But certainly that will be
13   the first month that you were working at
14   Equinox; is that correct?
15        A.    Yes, absolutely.
16        Q.    Ms. Europe, what was your
17   understanding of what you were supposed to do
18   if you believed that you were subjected to
19   discrimination?
20        A.    I believe I was supposed to contact
21   people services.
22        Q.    And when you say "people services,"
23   is that anyone specific that your referring to?
24        A.    No, people services was Equinox's
25   name for human resources, as I recall.  And I
```

```
                              EUROPE
 1
 2   believe I was most familiar with Stephanie
 3   Herrmann, so I often contacted her directly,
 4   but people services was just a department.  So
 5   if she wasn't available, there were certainly
 6   other people.
 7        Q.     Who was Stephanie Herrmann?
 8        A.     She worked in people services.
 9        Q.     Do you recall what her title was?
10        A.     I do not.
11        Q.     What communications do you recall
12   having with Stephanie Herrmann?
13        A.     We e-mailed on occasion and spoke on
14   the phone on occasion.
15        Q.     Did you find her to be responsive
16   when you needed something from her?
17        A.     Yes.
18        Q.     If you could go back to the second
19   page of the policy -- or the second page of the
20   document, there's a policy that says,
21   Reasonable Accommodation for Disabilities.
22   This is Bates D39.  One down from there.
23        A.     Yes.
24        Q.     There is a policy here, Reasonable
25   Accommodation for Disabilities.
```

```
                                          Page 43

  1                    EUROPE
  2          What was your understanding of what
  3   you were supposed to do if you needed to
  4   request some sort of an accommodation related
  5   to disability?
  6        A.    To contact my direct supervisor or
  7   people services to request the accommodation.
  8        Q.    And did you ever avail yourself of
  9   that policy?
 10        A.    Yes.
 11        Q.    When was that?
 12        A.    I contacted people services in, I
 13   believe it was May or June of 2019 to request
 14   accommodations, yes.
 15        Q.    And was that Ms. Herrmann you
 16   contacted or someone else?
 17        A.    Ms. Herrmann.
 18        Q.    And was Ms. Herrmann responsive?
 19        A.    Yes.
 20        Q.    Did Ms. Herrmann grant your request?
 21        A.    Yes.
 22        Q.    Was there ever any request for an
 23   accommodation you requested of Equinox that was
 24   not granted?
 25        A.    Not that I can recall from
```

```
                              EUROPE
 1
 2    Ms. Herrmann.
 3         Q.    Okay.  We are going to get back to
 4    that in a little more detail in a little while.
 5              And are you aware of whether there
 6    was an anti-retaliation policy at Equinox?
 7         A.    I was not aware of whether there was
 8    an anti-retaliation policy, but I was aware
 9    that it's not legal, so...
10              MR. SHILOH:  What was that last
11         response?  It's not what?
12              THE WITNESS:  I was aware that
13         retaliation was not legal.
14              MR. SHILOH:  Thank you.
15         Q.    If you scroll a bit down further of
16    this page that we are looking at here, there is
17    a heading Unlawful Discrimination, Harassment
18    and Retaliation Policy, which begins on D39 --
19         A.    Yes.
20         Q.    -- and it continues for a few pages
21    thereafter until D42, it looks like.
22              Do you recall reading this policy
23    when you received the handbook?
24         A.    Yes.
25         Q.    And would you agree that at the
```

Page 45

                        EUROPE
1
2    bottom of the page you are on now, D40, there
3    is a section on retaliation, which is continued
4    on the top of the next page?
5        A.    Yes.
6        Q.    And what was your understanding of
7    what you're supposed to do if you believe you
8    were subjected to conduct that was in violation
9    of the anti-retaliation policy?
10       A.    As I recall, the protocol would have
11   been to contact people services for nearly
12   anything of this nature.
13       Q.    And if you just take a look at this
14   paragraph that's on the page we are looking at,
15   D41, that starts with, "The following steps
16   have been put into place to ensure the work
17   environment at Equinox is respectful,
18   professional and free of discrimination,
19   harassment and retaliation."
20             Does that refresh your recollection
21   at all about the different ways an employee
22   could report perceived discrimination,
23   harassment, or retaliation?
24       A.    Yes.
25       Q.    And what were the different ways?

```
                                          Page 47

 1                    EUROPE
 2   refers to if you make a complaint and have not
 3   received a satisfactory response within five
 4   business days to contact the corporate people
 5   services executive immediately.
 6             Other than Stephanie Herrmann, was
 7   there ever anyone else you contacted at people
 8   services to the best of your recollection?
 9        A.    No, sir.
10        Q.    Were there ever any complaints you
11   made that you did not receive a satisfactory
12   response to?
13        A.    Define "satisfactory."
14        Q.    Were there ever any complaints that
15   you lodged that you did not believe your
16   complaint was being properly addressed?
17        A.    By Stephanie, no.
18        Q.    Were there ever complaints that you
19   raised with others that you believe were not
20   properly addressed?
21        A.    Yes.
22        Q.    And what were those?
23        A.    I raised complaints with Jose about
24   the kind of support and guidance I was
25   receiving in the department and my ability to
```

```
                                        Page 48
 1                   EUROPE
 2   work with and supervise Chris Maltman.
 3       Q.    And did you consider that to be a
 4   complaint under this policy?
 5       A.    No, it was -- I mean, perhaps.  I
 6   was speaking to my supervisor, but I wouldn't
 7   say that it was necessarily related to
 8   retaliation or harassment.  It was just
 9   speaking to my supervisor about needing more
10   support.
11       Q.    So would you agree you had
12   difficulty supervising Chris Maltman, but it
13   wasn't about harassment or discrimination or
14   retaliation?
15           MS. LIEDERMAN:  Objection.
16           You can answer.
17       A.    It was not about harassment,
18   discrimination or retaliation directed at me
19   personally.
20       Q.    Do you believe that Mr. Maltman ever
21   engaged in conduct that was harassing,
22   discriminatory or retaliatory that was directed
23   towards you personally?
24       A.    Toward me personally?
25       Q.    Yes.
```

```
                                        Page 49
 1                   EUROPE
 2        A.    I do believe there were
 3   inappropriate interactions usually concerning
 4   others that made me uncomfortable.
 5        Q.    What interactions are you referring
 6   to?
 7        A.    There was an interaction when he
 8   asked me to walk to a nearby coffee shop
 9   because he wanted to ask out one of the women
10   working at the coffee shop who was a very young
11   African-American woman and he asked if I would
12   wait outside the coffee shop for him so that it
13   wouldn't seem weird that he was still inside
14   speaking to her.
15               There were other times when
16   Mr. Maltman commented on the appearance of
17   members of the gym that made me quite
18   uncomfortable.  There were things said to
19   members of my staff, specifically Sabrina
20   McGeary that I was alerted to that made me
21   uncomfortable.  So these things weren't
22   directed at me personally, but they were
23   certainly things that I needed to go to people
24   services about.
25        Q.    The first one you mentioned that had
```

1               EUROPE

2        A.     I wouldn't say a tendency, but we

3   were permitted to take breaks.  So if we both

4   wanted to go to the coffee shop, we would often

5   go together.

6        Q.     Did you and Chris generally get

7   along?

8        A.     Hmm.  Chris and I had a pretty -- it

9   was a professional relationship where I

10  certainly would not say that we were friends,

11  but we interacted in a cordial way on an almost

12  daily basis.

13       Q.     Uh-huh.  Okay.  So, I mean, you

14  could go or not go to the coffee shop with him,

15  correct?  He couldn't force you to, would you

16  agree?

17       A.     Yes.

18       Q.     And, I mean, in fact, you were his

19  supervisor, correct?

20       A.     Yes.

21       Q.     So did you know that he wanted to go

22  to the coffee shop because he wanted to ask out

23  an employee there?

24       A.     Not until we were on the walk to the

25  coffee shop.

```
                                              Page 52
 1                      EUROPE
 2        Q.     And what did he tell you during the
 3   walk?
 4        A.     He told me that there was a girl who
 5   worked at the coffee shop who he believed was
 6   interested in him and that he wanted to go
 7   speak to her because he knew that that day was
 8   her last day.
 9        Q.     And did you find something
10   inappropriate about that?
11        A.     When I saw the girl, yes.
12        Q.     And what was that?
13        A.     She was very young.
14        Q.     Other than the fact that you found
15   her to appear very young, was there anything
16   you found inappropriate about this?
17        A.     I also thought it was somewhat
18   inappropriate to ask a supervisor to come with
19   you to flirt with or hit on or ask out someone
20   who, you know, I mean, there was no reason to
21   invite me for that sort of interaction except
22   that he hoped that having another person,
23   possibly another black woman there would
24   validate that interaction.
25        Q.     You testified before that you did
```

Page 53

1                          EUROPE
2     from time to time get coffee with him, correct?
3          A.     Yes.
4          Q.     So was there anything unusual about
5     the fact that he asked you to go get coffee
6     with him?
7          A.     Not until we were on the walk to the
8     coffee shop.
9          Q.     And did he tell you that he wanted
10    you to go because you were African American?
11         A.     No, he said he wanted me to go so
12    that it wouldn't be awkward to speak to this
13    girl.
14         Q.     And do you find anything unusual
15    about that?
16         A.     About asking me to go with him so he
17    could speak to a woman?
18         Q.     Yes.
19         A.     Yes, Chris and I were not friends.
20    We were friendly, but we were not friends.
21    Going to get coffee and involving me in your
22    romantic pursuits are different.
23         Q.     Did he make any reference to the
24    employee's race?
25         A.     No.

```
                                                Page 56
 1                     EUROPE
 2        Q.    And how did he respond?
 3        A.    He objected to that assessment of
 4   the situation.
 5        Q.    Anything further that you ever
 6   discussed with him about this woman?
 7        A.    No, because as I recall, she was
 8   hard to nail down for plans from the get-go.
 9   So as far as I know, they never actually hung
10   out and he stopped speaking about her, but
11   obviously I'm not involved in Chris' personal
12   life.
13        Q.    And in any of your discussions with
14   Mr. Maltman about this woman, was there ever
15   any reference to her race?
16        A.    No.
17        Q.    You mentioned that Mr. Maltman
18   commented on the appearance of members at the
19   gym; is that correct?
20        A.    Yes.
21        Q.    And what members are you referring
22   to?
23        A.    Typically black female members, but
24   specifically one member named Janeen.
25        Q.    What was the name?
```

```
                                              Page 58
 1               EUROPE
 2   anything he was receiving from his supervisor
 3   that he should concerned about.
 4       Q.    Did you ever tell your supervisor
 5   that you believed that Mr. Maltman was
 6   inappropriately commenting on the appearance of
 7   a member?
 8       A.    As I recall, no.
 9       Q.    Did you ever tell people services
10   that Mr. Maltman was commenting inappropriately
11   or what you believed to be inappropriate about
12   a member?
13       A.    No.
14       Q.    Any reason why not?
15       A.    These comments were said to me
16   mostly not around other employees or other
17   members.  So it seemed to be an interaction
18   that would take care of itself by me just
19   saying I didn't think it was cool.  Also I feel
20   like at that time a pattern had not been made
21   apparent that Chris tended to say inappropriate
22   things.
23       Q.    Were there any other members that
24   Chris commented on their appearance?
25       A.    He also commented on the appearance
```

```
 1                    EUROPE
 2   comments that he made about members, you
 3   referenced Sabrina McGeary.  We are going to
 4   get back to Sabrina in a couple minutes.
 5             But other than those three, anything
 6   else that you had in mind when you said that
 7   you believed Mr. Maltman acted inappropriately?
 8        A.   I do believe there were other
 9   inappropriate things that were not related to
10   comments about people's appearance, sexuality,
11   things of that sort.
12        Q.   I'm sorry, you said were not related
13   to appearance or sexuality?
14        A.   Yes, I believe that he was not
15   particularly respectful toward me as his
16   supervisor, and I do believe that there were
17   actions that undermined my role as the leader
18   of the department, but those are not things
19   related to harassment, discrimination, you
20   know...
21        Q.   Okay.  What was the issue with
22   Sabrina McGeary that you found to be
23   inappropriate?
24        A.   On one occasion, he asserted that
25   she must be the sister of a front desk
```

```
 1                    EUROPE
 2   attendant who also happened to be a
 3   curly-haired, brown-skinned woman.  They were
 4   not related.
 5            And when I mentioned to him that it
 6   was inappropriate for him to suggest that they
 7   must be related simply because they were both
 8   brown-skinned women with curly hair, he asked
 9   me, so I'm not supposed to comment on someone's
10   appearance if I think they look alike?  And I
11   told him, no, it was inappropriate.  He should
12   keep his thoughts to himself especially with
13   regard to the staff.
14            So that was one incident.
15            I also took issue with Mr. Maltman
16   asking Sabrina if she was autistic during a
17   staff meeting in front of the staff.  It was
18   four or five.  And I also learned from Sabrina
19   that he had made comments about how good she
20   looked in her leggings, which she was very
21   uncomfortable with, and asked me at that time
22   if I would be present for all of her meetings
23   with Mr. Maltman because she didn't want to be
24   alone in a room with him.
25            So those are the three that come to
```

```
 1                    EUROPE
 2    mind immediately right now.
 3         Q.    Did you reprimand Mr. Maltman for
 4    any of his comments that you perceived as
 5    inappropriate toward Sabrina McGeary?
 6         A.    Again, I didn't have the power to
 7    reprimand him at all, but I did reach out to
 8    people services about these comments.
 9         Q.    And do you know if people services
10    took action?
11         A.    At the time I did not know if people
12    services took action because it would have been
13    a human resources violation for them to tell me
14    any of those details, but now I am aware that
15    they did speak to him about it.
16         Q.    When you say "now," what time period
17    are you referring to?
18         A.    Now since discovery has happened
19    regarding this case.
20         Q.    And how did you learn that they took
21    action, "they" being people services?
22         A.    Since discovery has happened in this
23    case I was able to see the record of discussion
24    that he received.
25         Q.    So as you sit here today, are you
```

```
                                        Page 64
 1                      EUROPE
 2    aware of any comments or actions by Mr. Maltman
 3    that you perceived to be inappropriate that
 4    were escalated to people services that were not
 5    acted on by people services?
 6        A.    Not that I am aware of at this
 7    moment.  If I think of something I will let you
 8    know.
 9        Q.    Okay.  Great.  If we could just go
10    back to the document that had been marked as
11    Defendants' Exhibit 1 and I will try to share
12    my screen again the same way.
13             If you're able to see that,
14    Ms. Europe, and you are able to scroll down to
15    the page which is Bates D45.  I believe it's
16    the eighth page of that PDF.  Just passed it.
17        A.    Yeah, this thing is hard to control.
18    (Document review.)
19        Q.    So we are looking at the policy in
20    the employee handbook, which is titled
21    Attendance and Punctuality.
22             Do you recall reviewing this policy
23    when you received the handbook at or around the
24    start of your employment with Equinox?
25        A.    Yes.
```

```
                                                    Page 65
 1                          EUROPE
 2        Q.     And what did you understand this
 3   policy to mean as far as, you know, being
 4   punctual for work?
 5        A.     That I was required to alert someone
 6   if I was going to be absent or late, you know,
 7   that I might need a letter from a doctor if I
 8   was going to be absent for several days.  That
 9   I would need to find someone to cover my shift,
10   if I couldn't cover the shift.  And that
11   failing to work as I was scheduled would be
12   problematic and could lead to termination.
13        Q.     And was it your understanding that
14   this policy applied to all employees in the
15   clubs including managers?
16        A.     Yes.
17        Q.     Just referring to the last page of
18   the policy, the one that starts with arriving
19   on time for your scheduled shift, what does it
20   say about if you are going to be running more
21   than ten minutes late?
22        A.     It says, "If you expect to be more
23   than ten minutes late, call your manager
24   immediately so that someone will be able to
25   cover your duties until you arrive.  Routinely
```

```
                                          Page 66
 1                    EUROPE
 2   reporting to work late and failing to work your
 3   scheduled hours are violations of Equinox
 4   policy that can result in termination."
 5        Q.    Were there times during your
 6   employment with Equinox where you were arriving
 7   more than ten minutes late for work?
 8        A.    Yes.
 9        Q.    How many times did that happen?
10        A.    I couldn't give you an exact number.
11        Q.    More than five?
12        A.    Yes.
13        Q.    More than ten?
14        A.    Yes.
15        Q.    More than 50?
16        A.    I don't know about more than 50, but
17   certainly more than 5 or 10.
18        Q.    More than 25?
19        A.    Yes.
20        Q.    Okay.  So your estimate, sitting
21   here today, would be somewhere between 25 and
22   50 times perhaps?
23        A.    Sure.
24        Q.    And did you have a practice of
25   calling your manager when that was happening?
```

```
                                                  Page 67
                            EUROPE
 1
 2        A.      Initially, no.  And after I received
 3   an ROD, I did usually text message or otherwise
 4   contact my manager.  Typically, it was from the
 5   subway, so calling wasn't an option.
 6        Q.      When you say "typically," that means
 7   sometimes you did not do that?
 8        A.      Yes.
 9        Q.      Did you struggle with getting to
10   work on time at Equinox?
11        A.      Yes.
12        Q.      And why was that?
13        A.      A combination of the distance that I
14   lived from the club, the number of transfers on
15   the subway that were required to make it to the
16   club, and the fact that, even though Equinox
17   workdays are scheduled to be ten hours, I was
18   often there for significantly more than ten
19   hours.  Sometimes 12 hours, sometimes 13 hours
20   and, you know, I would oversleep occasionally
21   because being at work for 13 hours is
22   exhausting.
23        Q.      Would you agree that, as a manager,
24   it was your responsibility to stay there for
25   the workday, however long that wound up
```

```
                                              Page 69
 1                     EUROPE
 2        Q.    So there were instances when you
 3   recommended to those above you or people
 4   services that your direct reports be
 5   disciplined because they had trouble coming to
 6   work on time?
 7        A.    Yes.
 8        Q.    Given that it happened in excess of
 9   25 times that you were more than ten minutes
10   late for work, would you agree that your
11   failure to arrive on time warranted discipline?
12        A.    I would agree that anyone's failure
13   to arrive at work on time would warrant
14   discipline whether it was mine or other
15   employees.
16        Q.    When were you first told -- or
17   withdrawn.
18             At some point in time did your
19   supervisor tell you that that you needed to
20   improve on your time and attendance, in
21   particular, arriving to work on time?
22        A.    Yes.  I received a record of
23   discussion.
24        Q.    Prior to receiving a record of
25   discussion, was it ever informally raised with
```

```
1                    EUROPE
2    you verbally?
3         A.    Informally, yes.
4         Q.    When was the first time that
5    happened?
6         A.    I honestly don't recall.
7         Q.    Was it during the first month you
8    were at the East 92nd Street club?
9         A.    I don't believe so, but, again, I
10   don't recall.
11        Q.    Well, you started in late
12   December 2018 at East 92nd Street, correct?
13        A.    Yes.
14        Q.    Do you recall if between late
15   December and mid -- late December 2018 and mid
16   February 2019 you were verbally counseled about
17   coming to work on time?
18        A.    I don't recall.  It's been many
19   years.  It's possible.
20        Q.    When -- or withdrawn.
21              Who was it that first brought to
22   your attention that you were struggling and
23   needed to improve on your punctuality?
24        A.    Jose Taveras.
25        Q.    And where were you when you had that
```

```
 1                        EUROPE
 2        Q.    Were there times when you were more
 3   than two hours late?
 4        A.    I don't believe so.
 5        Q.    Were there times that you didn't
 6   show up for work at all on days when you were
 7   scheduled to be at work without prior notice?
 8        A.    Oh, certainly not, no.
 9        Q.    After that first conversation with
10   Jose, when was the next time that it was
11   brought to your attention that you were not
12   demonstrating sufficient punctuality?
13        A.    When I received my first record of
14   discussion.
15        Q.    And when was that?
16        A.    I do not recall, but it was the day
17   that is on the ROD.
18        Q.    Okay.
19              MR. ZOLDESSY:  We are going to mark
20        this next one as Defendants' Exhibit 2.
21        It's a two-page document, Bates D10 and
22        D11, which I am sharing now on the screen
23        hopefully.
24              (Defendants' Exhibit 2, Record of
25        Discussion, Bates Stamped D000010 through
```

Page 73

1                    EUROPE

2       11, marked for identification.)

3       Q.    Mr. Europe, if you can just let me

4  know if you are able to access the exhibit.

5       A.    Yes.

6       Q.    So does this refresh your

7  recollection of when you first received a

8  record of discussion about time and attendance?

9       A.    Yes.

10      Q.    And when was that?

11      A.    April 15 according to this document.

12      Q.    And do you recall receiving this

13  document on April 15 of 2019?

14      A.    Yes.

15      Q.    And was there anything in the

16  document that you believed to be incorrect or

17  inaccurate?

18      A.    As the document is written, no, but

19  the reality is that Equinox managers were not

20  hourly employees.  We did not punch in and out

21  of a time clock at any point.  Hourly employees

22  did, but we did not.  These times were based on

23  what time I checked into the club at the front

24  desk, which was a security measure exclusively.

25  Members also had to do it.  We were expected to

Page 74

```
1                    EUROPE
2   do it every single time we walked into the
3   building whether we were arriving for work or
4   going out for lunch.
5            It often happens that the front desk
6   was swamped and sometimes we didn't check in.
7   So my only concern was that these times reflect
8   the time that I checked into the club with my
9   key tag and not necessarily the time that I
10  arrived at work or started work.
11       Q.    But you would agree there were
12  certainly times when you arrived to work later
13  than you were scheduled to arrive to work; is
14  that correct?
15       A.    Yes.
16       Q.    And in the employee comment section
17  on the bottom of the first page there, the
18  handwriting there, is that your handwriting?
19       A.    Yes.
20       Q.    On the top of the next page on the
21  right side the acknowledgment section, is that
22  your signature there?
23       A.    Yes.
24       Q.    And the supervisor's signature here
25  looks like it was Jose Taveras; is that
```

```
 1                     EUROPE
 2   correct?
 3        A.    Yes.
 4        Q.    Was there any other counseling that
 5   Mr. Taveras gave you at that time about
 6   arriving to work on time?
 7        A.    Not that I recall.
 8        Q.    Were you concerned after receiving
 9   this record of discussion that your job could
10   be in jeopardy?
11        A.    No.
12        Q.    Why is that?
13        A.    Because several other employees were
14   late all of the time and at this point I was
15   unaware of whether they had received any kind
16   of record of discussion or not, but people were
17   late daily.  Jose was late almost daily, so it
18   didn't seem to be a huge issue.
19        Q.    Did you have any idea whether Jose
20   had ever been counseled about time and
21   attendance?
22        A.    At the time, no.
23        Q.    Does that mean that now you do have
24   an idea as to whether he was?
25        A.    Well, now that discovery has
```

Page 76

```
                              EUROPE
 1
 2    happened for this case I'm aware that he did
 3    not receive records of discussion for time and
 4    attendance.
 5         Q.    But you would agree after the
 6    April 2019 record of discussion was issued to
 7    you that you had to improve on your time and
 8    attendance; is that correct?
 9         A.    Yes.
10         Q.    And did you, in fact, improve on it?
11         A.    Yes.
12         Q.    Why do you say that?
13         A.    The amount of time that -- the
14    discrepancy between the time that I was
15    supposed to arrive on the schedule and the time
16    that I arrived shortened significantly.
17         Q.    Did there continue to be times,
18    though, when you arrived more than ten minutes
19    late for the start of your scheduled shift?
20         A.    Yes.
21         Q.    How often did that happen after the
22    record of discussion was issued in April?
23         A.    I don't recall, but there was a
24    second record of discussion that probably lists
25    it.
```

Page 77

```
                                 EUROPE
 1
 2        Q.    And when was that second record of
 3   discussion issued?
 4        A.    I don't recall the date on that
 5   record of discussion.
 6        Q.    Okay.
 7              MR. ZOLDESSY:  I'm going to share
 8        what has been marked as Defendants'
 9        Exhibit 3, which is a two-page document,
10        Bates D12 and D13.
11              (Defendants' Exhibit 3, Record of
12        Discussion, Bates Stamped D000012 through
13        13, marked for identification.)
14        Q.    Can you just take a minute to read
15   through this?
16        A.    (Document review.)
17        Q.    Ms. Europe, this document which has
18   been marked as Exhibit 3, what do you recognize
19   this to be?
20        A.    The second record of discussion.
21        Q.    Does this refresh your recollection
22   as to when it was issued?
23        A.    Yes, let me scroll back up.  I, for
24   some reason, don't see a date on this, but I
25   guess the times listed would suggest that it
```

1                         EUROPE

2    was the end of May or the start of June, but I

3    don't see a date listed.

4               Oh, it looks like Rob signed it on

5    June 5, 2019, so...

6        Q.    Any reason to believe that it was

7    not issued to you on or about June 5, 2019?

8        A.    Yeah, I would say it was about

9    June 5, 2019.

10       Q.    Okay.  Is there anything in this

11   document that you believe is incorrect or

12   inaccurate?

13       A.    With regard to what?

14       Q.    Just the contents of it, the factual

15   content of it, is there anything you think is

16   inaccurate?

17       A.    Yes, again, I would say that

18   managers did not clock in or out.  For example,

19   there is no record of the time that I left the

20   club because we were not hourly employees.

21   These times reflect the time that I checked in

22   to the club at the front desk and not

23   necessarily the time that I arrived at work or

24   began work.

25       Q.    All of the entries here, they all

1              EUROPE
2    have to do with arriving late to work, not
3    about what time you're leaving work; is that
4    correct?
5         A.    Yes.
6         Q.    And would you agree that on most, if
7    not all, of these dates which are listed here
8    that you arrived to work later than your
9    scheduled time?
10        A.    Later than my scheduled time, maybe.
11   Checked in to the club later than my scheduled
12   term, certainly.
13        Q.    On the second page of the document
14   under the employee comments section, is that
15   your handwriting there?
16        A.    Yes.
17        Q.    Is that your signature under the
18   employee signature line?
19        A.    I believe so, I'm scrolling.  Sorry.
20   Yes.
21        Q.    And at the time you received this,
22   did you understand you needed to improve on
23   your time and attendance, and in particular get
24   into work on time?
25        A.    I understood that I was receiving a

```
 1                    EUROPE
 2  record of discussion for being late.  And I
 3  also understood that many other employees were
 4  late frequently, so I needed to do what was
 5  required to not receive another record of
 6  discussion.  But, again, other employees were
 7  not reprimanded for the same behavior.
 8       Q.    Were you privy to the files of all
 9  employees in the club that would indicate to
10  you whether or not they were reprimanded or
11  issued records of discussion for time and
12  attendance?
13       A.    At that time, no.
14       Q.    So what was the basis for your
15  statement on the second page here that other
16  employees are last without repercussions?
17       A.    Because I would mention to other
18  people that I had been spoken to or that I got
19  a record of discussion once and I would learn
20  that they had not been reprimanded.  Chris in
21  particular was late not infrequently and I
22  remember the times that I mentioned to him
23  that -- that Jose had spoken to me or
24  especially after my first ROD and the second
25  ROD, he seemed to believe at the time that it
```

```
                                            Page 82
 1                    EUROPE
 2   be in jeopardy unless it was a biased, targeted
 3   thing.
 4        Q.    Were there other discussions, verbal
 5   discussions that Jose Taveras had with you at
 6   or around this time about coming to work on
 7   time?
 8        A.    No, I believe the second time we
 9   discussed it after the first ROD was when I
10   received the second ROD.
11        Q.    And how about after the second ROD?
12        A.    Again, I don't believe so.  I
13   believe it wasn't discussed again until I was
14   terminated.
15        Q.    Other than Jose Taveras, were there
16   any other supervisory employees that ever
17   discussed time and attendance with you?
18        A.    Not that I recall, but, again, it's
19   been quite some time.
20        Q.    Did you ever reach out to people
21   services about issuance of either the
22   April 2019 ROD or the June 29 -- I'm sorry, the
23   June 2019 ROD to discuss, you know, why these
24   were being issued to you?
25        A.    No.  My understanding was that
```

```
                                              Page 83
 1                    EUROPE
 2   people services would ultimately receive a copy
 3   of any ROD that was issued.  So they would see
 4   my commentary.  I didn't feel at the time it
 5   necessary to contact them directly.
 6        Q.    And did people services ever reach
 7   out to you about your comments on the June 2019
 8   ROD?
 9        A.    No.
10        Q.    So did you ever think to follow up
11   given that they never reached out to you about
12   it?
13        A.    No.
14        Q.    Any reason why not?
15        A.    Again, my understanding was that
16   people services received a copy of all records
17   of discussion so my thought was that they would
18   see my commentary regardless of whether they
19   reached out to me about it or not.
20        Q.    Did your punctuality improve after
21   issuance of the June 2019 ROD?
22        A.    Maybe.  I do not recall.
23        Q.    Did you keep track of what time you
24   arrived at work each day?
25        A.    No.
```

1            EUROPE
2       Q.    So other than these check-in records
3   which Equinox maintained, are there any other
4   records you're aware of existing which would
5   indicate what time you were arriving at work
6   every day?
7       A.    Not that I'm aware of, but, again,
8   these check-ins were a security measure, not a
9   way of tracking when employees arrived or left
10  work.
11      Q.    Okay.  But regardless of the
12  methodology used, you would still agree that
13  managers had to be at work within ten minutes
14  of their scheduled shift time; is that correct?
15      A.    Absolutely.
16      Q.    So at some point in time then after
17  the June 2019 record of discussion, was it
18  again brought to your attention that your time
19  and attendance and in particular your getting
20  to work on time was not satisfactory?
21      A.    It was brought to my attention when
22  I received my final ROD.
23      Q.    And when was that?
24      A.    I believe in September of 2019.
25      Q.    And was that the notice of your

Page 85

1                    EUROPE

2    termination?

3         A.    Yes.

4              MR. ZOLDESSY:  Let's just mark this

5         one as Defendants' Exhibit 4.

6              (Defendants' Exhibit 4, Record of

7         Involuntary Separation, Bates Stamped

8         D000014, marked for identification.)

9         Q.    I just shared what's marked as

10   Defendants' Exhibit 4.  It's a one-page

11   document which is Bates D14.

12        A.    (Document review.)

13        Q.    Ms. Europe, this document, once you

14   have had a chance to review, if you just let me

15   know and tell me what you recognize this to be.

16        A.    Yes, it was my final ROD.

17        Q.    And this was issued September 24,

18   2019; is that correct?

19        A.    Yes.

20        Q.    And the signatures on there, it

21   looks like there is a manager's signature, Rob

22   Avellan.

23              What was Rob's position at the time?

24        A.    Rob took over Josh Harrison's

25   position after Josh resigned.

Page 87

1                          EUROPE
2    Again, it was a security measure.  It was
3    frequent that you would show up as an employee
4    of the club and perhaps not check in because
5    you were an employee of the club and the front
6    desk would be swamped and they would say, okay,
7    hi, good to see you and go to work.
8          Q.    Was it the expectation that you
9    would check in when you arrived at work for the
10   day?
11         A.    Yes, the expectation was that every
12   person who entered the building would check in
13   whether they were there for work or not.
14         Q.    And the place where you would check
15   in, where was that in relation to the entrance
16   to the club?
17         A.    There was the front doors to the
18   club, and then immediately past the front doors
19   on the right, there were two elevators that
20   went up to my office and Chris' office and
21   maybe about 20 feet past the front door was the
22   front desk.  And behind the front desk was
23   Jose's office and the membership advisor's
24   office.
25         Q.    The hourly employees who reported to

```
 1                    EUROPE
 2       Q.    Other than the comments that you
 3   wrote in the two RODs that we just looked at,
 4   the June 2019 ROD and then the September record
 5   of involuntary separation, did you ever put in
 6   writing to Equinox that you believed that you
 7   were being treated unfairly?
 8       A.    Yes, I reached out to Paul Kwon
 9   after I was terminated with some of the dates
10   and times that Jose arrived late and mentioned
11   that they should look into Jose's time and
12   attendance because I had just been terminated
13   for mine and Jose was late as frequently.
14       Q.    Paul Kwon -- I should have asked you
15   earlier.  I see his name was on the record of
16   involuntary separation.
17             Who was Paul Kwon?
18       A.    To be honest, I don't remember if I
19   met Paul Kwon at any point prior -- well, I
20   have never met Paul Kwon.  So I believe he
21   worked in human resources, but to be honest
22   with you, I don't know.  I just know that he
23   was the person that I was put in contact with
24   after I was terminated when I wanted to reach
25   out to human resources.
```

```
                              EUROPE
 1
 2        Q.     Do you know if Paul reported to
 3   Stephanie Herrmann?
 4        A.     I believe Stephanie -- I thought
 5   Stephanie had left the company at the time that
 6   I was terminated, but I'm not certain.  I don't
 7   think he answered to her, but there is no way
 8   for me to know.
 9        Q.     Who put you in touch with Paul after
10   you were terminated?
11        A.     I reached out to Equinox directly to
12   find out how I would contact human resources.
13   I believe I called.  I'm not certain, but I
14   believe I called.
15             And I believe Paul reached out to me
16   after I said I needed to speak with someone
17   from human resources, but I'm a little fuzzy on
18   that.
19        Q.     No problem.  So other than the two
20   RODs, meaning the June and the September RODs,
21   the September being the record of involuntary
22   separation and the e-mail you sent to Paul Kwon
23   after you were terminated in September of 2019,
24   did you ever put in writing, and I would
25   include an e-mail or electronic communication,
```

Page 95

1                    EUROPE
2    to Equinox that you believed you were being
3    treated unfairly or that there was bias?
4         A.    Aside from what is written in these
5    RODs, no, I never put it in writing.  It seemed
6    to be the sort of thing that would put a target
7    on my back, which I believed there already was.
8         Q.    Why do you believe there was already
9    a target on your back?
10        A.    Because I was the only person being
11   reprimanded for time and attendance issues,
12   usually after I had gone to human resources,
13   people services, for some other purpose.
14        Q.    Why did you believe that there was a
15   target being put on your back, though?  Why did
16   you believe that they would target you?
17        A.    I was the only person going to
18   people services frequently about things
19   occurring in the club.  When things occurred
20   negatively at the club that reflected directly
21   on Jose Taveras' leadership, so they would
22   immediately contact him about what was
23   happening in the club.
24             In turn, Jose Taveras would write me
25   and me exclusively up for time and attendance

```
                                          Page 99
 1                    EUROPE
 2    directly it was regarding one of the Sabrina
 3    incidents, but prior to that I had certainly
 4    gone to other supervisors about the lack of
 5    support that I was receiving at the club, about
 6    the fact that Jose was often not at the club.
 7              You know, I mentioned those things
 8    to other people even though I didn't take it to
 9    human resources because it didn't seem to need
10    to be escalated at that point.
11        Q.    Did you consider complaining about
12    lack of resources or Jose's attendance to be
13    protected activity?
14        A.    No, but I do believe that that is
15    the sort of thing that would put a target on my
16    back if it ultimately goes back to Jose that
17    Röbynn Europe made a complaint about when he
18    arrived, when he leaves, whether he is
19    supporting her position, whether he is
20    supporting her department.
21        Q.    So what's the protected activity
22    here you're claiming that you went to people
23    services with that you believe put a target on
24    your back?
25        A.    I went to people services regarding
```

```
 1                    EUROPE
 2   a client, Mark Dorfman, who had requested a
 3   white male trainer and I went to -- I contacted
 4   Jose that night about that incident to let him
 5   know that I would not be pairing that member
 6   with a trainer because that would be
 7   discrimination against my staff, which is
 8   illegal.
 9             And he requested that I send him an
10   e-mail in writing so that he would have an --
11   he would have a record of what occurred and
12   what I was saying occurred.  And I did send him
13   that e-mail the next day, but I also contacted
14   people services about the incident.
15             Because aside from the fact that it
16   would be discrimination against my staff if I
17   paired them with clients based on race, it was
18   dehumanizing and demeaning to know that I
19   worked in a place where I could show up to
20   work, do my job well and still have to deal
21   with a membership advisor calling me in my
22   office and telling me that I need to pair
23   trainers with clients based on race.
24             Additionally, to find out that after
25   I brought this up with Jose and contacted
```

Page 101

1                         EUROPE
2    people services about it, Jose contacted Chris
3    Maltman and asked him to pair this client with
4    a trainer anyway was also problematic.  And I
5    contacted the people services again about that.
6    That's a protected activity.
7              I shouldn't be retaliated against
8    for contacting people services to let them know
9    that there are discriminatory, racist practices
10   happening in my location that are allowed by my
11   direct supervisor and, in fact, encouraged.
12        Q.    When did this all happen with the
13   communications with people services about that
14   client request that you perceived as being
15   discriminatory?
16        A.    I don't recall the exact date, but I
17   do know that that is one of the documents that
18   you have, so it would be the dates on those
19   e-mails.
20        Q.    Was it after you received the April
21   record of discussion?
22        A.    It was after I received the April
23   record of discussion, but I believe it was a
24   few days before I received the second record of
25   discussion.

Page 103

```
                        EUROPE
 1
 2    that I did not believe were being addressed
 3    adequately.
 4        Q.    Did people services take action in
 5    response to your escalating the issue about the
 6    client request you perceived as being
 7    discriminatory?
 8        A.    As I recall, they did.  People
 9    services was typically pretty good about
10    handling things in a timely fashion.
11        Q.    Were there employees who were
12    disciplined based on what happened?
13        A.    At the time I was unaware of whether
14    anyone was disciplined, but since discovery has
15    happened for this case, I'm aware that people
16    were disciplined.
17        Q.    Who are you aware of being
18    disciplined?
19        A.    Jose was disciplined and Cori
20    Faermann was disciplined.
21        Q.    So as you sit here today, would you
22    agree that once people services learned about
23    what happened in June it acted appropriately?
24        A.    People services regularly acted
25    appropriately.  That was entirely separate from
```

Page 104

                        EUROPE
1
2    what was occurring at the club level.
3         Q.    So to go back to my question, with
4    respect to the complaint you escalated, the
5    issue you escalated having to do with the
6    customer request, would you agree as you sit
7    here today that people services handled it
8    appropriately?
9         A.    I would say people services did what
10   they were able to do.
11        Q.    Well, they disciplined the general
12   manager of the club; is that correct?
13        A.    Sure.  That doesn't take care of the
14   fact that those things were occurring at
15   East 92nd Street in general, though.
16        Q.    You have testified that you believed
17   this issue with the customer was protected
18   activity and you believed that the concerns you
19   raised about Chris' comments towards Sabrina
20   McGeary were protected activity.
21             Were there any concerns you raised
22   with people services prior to either of those
23   incidents that you believe to be protected
24   activity?
25        A.    I believe my request for

```
                                            Page 105
 1                    EUROPE
 2   accommodation was also protected activity.
 3        Q.    And when did that first occur?
 4        A.    I believe it was in -- sorry, I have
 5   the hiccups -- I believe it was around June.
 6   It would have been around May or June of 2019,
 7   I believe.
 8        Q.    So would you agree that at the time
 9   you first engaged in protected activity, you
10   had already been issued at least one record of
11   discussion for time and attendance?
12        A.    Yes.
13              MR. ZOLDESSY:  Off the record for a
14        minute.
15              (Discussion off the record.)
16        Q.    Ms. Europe, other than what we have
17   already talked about, are there any other
18   communications that you had with people
19   services that you considered to be protected
20   activity?
21        A.    I contacted people services about a
22   managers' dinner that we were told was
23   mandatory that I did not want to attend because
24   of my disability and that my therapist
25   recommend that I not attend because of my
```

1                    EUROPE
2     accommodations.  I did contact them three times
3     regarding Sabrina McGeary.  I did contact them
4     about the client Mark Dorfman.  As I recall
5     there weren't other times that I contacted
6     them, but I'm not a hundred percent certain on
7     that, but those are the ones I can recall right
8     now.
9          Q.    Of all the ones you can recall, you
10    would agree, as you sit here today, that people
11    services took proper action in response to all
12    of them; is that correct?
13         A.    People services usually took
14    appropriate action, but, again, that was very
15    different than the treatment and experience I
16    had at the club level.
17         Q.    If you had a different experience at
18    the club level, couldn't you have escalated
19    that experience to people services with an
20    expectation they would have taken proper
21    action?
22         A.    Isn't that what we just said I did?
23         Q.    I'm asking you.
24         A.    I reached out to people services
25    when I had issues with what was happening at

```
 1                    EUROPE
 2   either hitting on me or involving me in him
 3   speaking about members at the club.
 4        Q.    Did Chris ever hit on you in your
 5   opinion?
 6        A.    Not that I recall.  I think I shut
 7   that down pretty quickly.
 8        Q.    Well, if it never happened, how did
 9   you shut it down?
10        A.    I had already been warned that that
11   was going to occur, so I was very clear based
12   on my interactions with him that we had a
13   professional relationship and that I wasn't --
14   I wasn't going to entertain that sort of
15   interaction.
16        Q.    Your complaint also alleges that you
17   believe you were discriminated against based on
18   your sex; is that correct?
19        A.    Yes.
20        Q.    And what's the basis for this claim?
21        A.    I believe that the evaluation of my
22   communication with my staff was unjust and it
23   is based on a -- you know, a pretty common
24   thing where people expect women to be somewhat
25   docile, friendly, jovial all the time and
```

```
                                        Page 120
 1                   EUROPE
 2    because I was performing my duties as a manager
 3    which were to lead the department, not to be
 4    friendly and loved by everyone, yes, I believe
 5    that that is discrimination based on my --
 6    based on my sex.
 7         Q.    Your sex being the fact that you are
 8    a woman?
 9         A.    Yes.
10         Q.    And there are plenty of other women
11    in management roles at Equinox, weren't there?
12         A.    Sure.
13         Q.    Do you believe that all women were
14    being subjected to disparate treatment based on
15    their gender or do you believe it was you
16    specifically?
17         A.    There's no way for me to know.  I
18    did not frequently ask other women about their
19    experiences at Equinox.
20              What I do know is that it came up
21    fairly regularly that I needed to put a little
22    more sugar on the way that I interacted with my
23    staff, and I do not believe that this would
24    have been the case if I had been male.
25              Jose certainly never sugarcoated
```

```
                                         Page 121
 1               EUROPE
 2    anything he said to me, but I was expected to
 3    be the friendliest, most well-liked manager
 4    instead of doing my job, which was to lead the
 5    department.
 6         Q.    Did you ever escalate to people
 7    services that you believed you were being
 8    subjected to discrimination based on your sex?
 9         A.    No.
10         Q.    Did you ever escalate to people
11    services that you believed you were being
12    subjected to discrimination based on your race?
13         A.    No.  Again, with both of those
14    things I believe that going to people services
15    without something that was a black-and-white
16    fact would put a target on my back.
17         Q.    Do the trainers and, you know, other
18    staff date one other from time to time?
19         A.    Sure.
20         Q.    Were there trainers -- to the best
21    of your knowledge during your employment, were
22    there trainers in your club who were dating
23    each other or other staff there?
24         A.    Yes.
25         Q.    And, you know, would there be any
```

1                    EUROPE

2    raise any other concerns to you about

3    Mr. Maltman?

4         A.    Which incident are you referring to?

5         Q.    Well, you allege that she made

6    comments about -- withdrawn.

7               You allege that Mr. Maltman made

8    comments to her which you escalated to people

9    services, correct?

10        A.    Yes.

11        Q.    And I believe you testified that at

12   least, you know, as you sit here now you know

13   that people services, in turn, disciplined

14   Mr. Maltman for this; is this correct?

15        A.    Ah.  Yes.

16        Q.    After -- and is it fair to say this

17   occurred in or around June of 2019?

18        A.    Yes.

19        Q.    From June of 2019 until your

20   employment with Equinox ended in September of

21   2019, did Ms. McGeary come to you with any

22   other concerns about Mr. Maltman?

23        A.    No.  She simply asked that I would

24   be present for her meetings with him because

25   she didn't feel comfortable with him.

```
 1                    EUROPE
 2       Q.    And were you, in fact, present for
 3   subsequent meetings that she had with
 4   Mr. Maltman?
 5       A.    I believe I was present for a couple
 6   of meetings that she had with Mr. Maltman.  It
 7   wasn't always a possibility based on schedules,
 8   but I believe I was present for a few.
 9       Q.    And did you ever witness Mr. Maltman
10   acting or stating anything to Ms. McGeary that
11   was inappropriate after that June 2019
12   incident?
13       A.    No, I believe that's why she asked
14   for my presence.
15       Q.    So as you sit here today, is there
16   anything you believe that Equinox should have
17   done differently in response to receiving your
18   report in June of 2019 pertaining to
19   Mr. Maltman and Ms. McGeary?
20       A.    Anything that I believe they should
21   have done differently?  My opinion?
22       Q.    Yes.
23       A.    Yes, I think that multiple
24   complaints about inappropriate comments,
25   calling someone autistic, commenting on their
```

```
 1                    EUROPE
 2       Q.    When did that happen?
 3       A.    I don't remember the exact date
 4   but -- yeah, I'm so sorry.  I don't remember
 5   the exact date.  I believe there is an e-mail
 6   in -- that has been submitted regarding that.
 7       Q.    The incident that you found to be
 8   inappropriate with the coffee shop, just to
 9   confirm, I believe you might have answered this
10   earlier, you never escalated this to people
11   services, correct?
12       A.    No.
13       Q.    And you never escalated it to any
14   other supervisor; is that correct?
15       A.    Correct.
16       Q.    Your complaint also alleges
17   discrimination based on a disability; is that
18   correct?
19       A.    Yes.
20       Q.    And what disability is it referring
21   to?
22       A.    An eating disorder.
23       Q.    What eating disorder?
24       A.    Bulimia.
25       Q.    And did you ever notify Equinox that
```

                                      Page 130

                              EUROPE

1

2    you were bulimic?

3         A.    Yes.   I contacted Stephanie Herrmann

4    directly.

5         Q.    And was that the discussion about

6    the managers' dinner that you referenced

7    earlier?

8         A.    Yes.

9         Q.    Other than Stephanie Herrmann, did

10   you ever advise any other Equinox manager or

11   representative that you were bulimic?

12        A.    Well, I e-mailed Michael Caporusso

13   about it.

14        Q.    When was that?

15        A.    When I was requesting a schedule

16   accommodation.

17        Q.    What month did that occur in?

18        A.    I believe it was in June of 2019.

19   It was perhaps July.  I honestly don't remember

20   the exact date that I contacted either of them,

21   but it was the dates of the e-mails that were

22   submitted.

23        Q.    And I believe you testified in both

24   instances, both the managers' dinner and the

25   scheduling, that these were both accommodations

1                    EUROPE
2    that were granted; is that correct?
3         A.    Yes.
4         Q.    So for what reason do you believe
5    that you were discriminated against based on a
6    disability?
7         A.    My issues were not usually with
8    people services or how things were handled at
9    that level.  My issues were with how things
10   occurred at the club level.  Not attending the
11   managers' dinner and not explaining to Jose why
12   I wasn't attending the managers' dinner or
13   pretending I was going to attend the managers'
14   dinner meant that I was treated rudely and
15   improperly by Jose.
16             When the scheduled accommodation was
17   made such that I would be the early shift and
18   Chris Maltman would be the late shift, I had to
19   deal with daily commentary from Chris of how
20   much of a burden it was that we had to switch
21   shifts, and he thought it was crazy that he had
22   to stay late.
23             In addition to the fact that, you
24   know, Jose and Chris typically, if I made any
25   kind of request, acted like I was putting some

```
                                            Page 132
 1                    EUROPE
 2   kind of burden on them.
 3        Q.    To the best of your knowledge, did
 4   Jose Taveras know that you had an eating
 5   disorder?
 6        A.    No, but it wasn't about whether he
 7   knew that I had an eating disorder.  It was
 8   about the fact that I went to people services
 9   outside of him and made a request that was
10   granted without -- without him.
11        Q.    To the best of your knowledge, was
12   Mr. Taveras familiar with the discussion or the
13   substance of the discussion that you had with
14   people services about the managers' dinner?
15        A.    I honestly don't know.
16        Q.    Would you agree that if he was not
17   familiar with it that he could not have been
18   discriminating against you based on a
19   disability?
20              MS. LIEDERMAN:  Objection.
21              You can answer.
22        A.    No, I would not say that because the
23   reality is you can discriminate against
24   someone -- first of all, you can discriminate
25   against someone and have their request granted
```

Page 134

EUROPE

1
2   not suggesting that he needed to know that I
3   had a disability or what the disability is.  I
4   am alleging that I requested accommodations,
5   was granted those accommodations, and was
6   discriminated against because I requested and
7   was granted those accommodations.
8        Q.    And in what way do you believe that
9   he discriminated against you because you
10  requested and were granted an accommodation for
11  the managers' dinner?
12            MS. LIEDERMAN:  Objection.
13            You can answer.
14       A.    The combination of communication.
15  The fact that I continued to be targeted for
16  time and attendance in a way that other club
17  employees were not targeted, you know, I can't
18  tell you that I would say any one thing points
19  to my experience of discrimination.  It was the
20  cumulative experience and treatment I received
21  over the entirety of my time at Equinox.
22       Q.    To the best of your knowledge, was
23  Chris Maltman aware of the fact that you had an
24  eating disorder?
25       A.    To the best of my knowledge, no.

```
                                                    Page 137
1                        EUROPE
2              MR. ZOLDESSY:  I defer to the group.
3         I could easily be persuaded either way.
4         Do you want to take a break now?
5              MS. LIEDERMAN:  Yeah, if you're not
6         in the middle of a line of questioning, I
7         think it would be appropriate.
8              MR. ZOLDESSY:  Let me just finish a
9         couple more things and we can take a break
10        for however long if everyone wants to take
11        a break.
12             MS. LIEDERMAN:  Okay.
13   BY MR. ZOLDESSY:
14        Q.    Would you agree, Ms. Europe, that
15   you -- you are of the opinion Mr. Taveras
16   discriminated against you because you made a
17   request for an accommodation pertaining to the
18   dinner even though he didn't know what exactly
19   your accommodation request was?
20        A.    Well, he knew what my accommodation
21   request was, the accommodation request was to
22   not attend the dinner.
23        Q.    But he didn't know the reason for
24   the request; is that correct?
25        A.    Correct.
```

```
 1                      EUROPE
 2      Q.    And would you agree that you're of
 3   the opinion that Mr. Maltman discriminated
 4   against you for making a request pertaining to
 5   the schedule even though you don't know whether
 6   Mr. Maltman knew of the reason for the
 7   scheduling request?
 8              MS. LIEDERMAN:  Objection.
 9              You can answer.
10      A.    That sounds like an accurate
11   statement.
12              MR. ZOLDESSY:  Okay.  Let's go off
13         the record for a minute.
14              (Luncheon recess taken at 1:09 a.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                     EUROPE
 2        A.    I believe that as Jose's supervisor,
 3    it was his job to, A, make sure that people at
 4    the club were being reprimanded equally and for
 5    similar behavior, and also to make sure that
 6    people that I work with, Jose, Chris, other
 7    managers, were acting appropriately.
 8        Q.    Do you know whether Jose Taveras
 9    spoke with Adam Gecht about the April 15, 2019,
10    ROD before it was issued to you?
11        A.    I do not know.
12        Q.    Do you know whether Adam Gecht saw
13    it before it was issued to you?
14        A.    I do not know.
15        Q.    Do you know if Adam Gecht had any
16    role in drafting the April 2019 ROD?
17        A.    I do not know.  I only know that the
18    chain of command would suggest that he had to
19    go to Adam before he could issue an ROD.
20        Q.    What's the basis for that statement?
21        A.    We always had to go to our superiors
22    before we could reprimand anyone.  So in the
23    same way that I could not reprimand my staff or
24    Chris without going to Jose first, Jose would
25    have had to go to someone above him before he
```

```
                         EUROPE
 1
 2   names at any point during my training, so...
 3       Q.    Did they ever specifically tell you
 4   that a general manager did not have discretion
 5   to issue an ROD on his or her own?
 6       A.    No, but they did say that managers
 7   could not issue RODs without speaking to a
 8   supervisor and people services first.  I
 9   assumed that that also applied to general
10   managers.
11       Q.    And would you agree that Adam Gecht
12   is not a signatory on the June 15, '20 -- I'm
13   sorry, the June 5, 2019, ROD either; is that
14   correct?
15       A.    Yes.
16       Q.    And are you aware of any discussions
17   that Jose Taveras had with Adam Gecht before
18   the June 2019 ROD was issued to you?
19       A.    I'm not certain on the date of it,
20   but I do know that after I mentioned that other
21   employees were late frequently an e-mail was
22   sent to Jose about his time and attendance, but
23   I don't recall the date on that, I'm so sorry.
24       Q.    Do you know whether Adam Gecht
25   reviewed the June 2019 ROD before it was issued
```

Page 144

                              EUROPE
1
2   to you?
3        A.    Factually, no.  But as a matter of
4   protocol, he certainly would have had to see
5   it.
6        Q.    And that's just based on your
7   understanding of what the protocol was from a
8   discussion that you had with people services
9   about what you, as a manager, could do on your
10  own?
11       A.    Yes.
12       Q.    Do you know whether Adam Gecht
13  approved the decision to terminate your
14  employment?
15       A.    I do not know.
16       Q.    So are you aware of any actual facts
17  that Adam Gecht had any role in either
18  disciplining you or terminating your
19  employment?
20       A.    Not related to that directly.  I am
21  aware of the fact that I went to Adam Gecht on
22  many occasions with regard to Jose's behavior,
23  his absences from the club, his lateness to the
24  club, his interactions with me, his inability
25  to perform duties in a timely manner, and Adam

```
                                    Page 145
 1                   EUROPE
 2   initially said I should speak to Jose about it
 3   directly and then said that if Jose could not
 4   perform his duties in a timely manner and
 5   continued to act in this way that I should go
 6   to him.
 7            So I did go to Adam a number of
 8   times about my interactions with Jose.
 9       Q.   And would you agree, based on what
10   you've seen in discovery, that Adam Gecht took
11   part on at least one occasion of disciplining
12   Jose Taveras for his performance?
13       A.   No, I would not agree with that.  An
14   informal e-mail is not discipline.
15       Q.   Are you aware of Jose Taveras ever
16   being disciplined?
17       A.   No, not for time and attendance.
18       Q.   I didn't say for time and
19   attendance, just in general.
20       A.   Ah.  I'm aware of him being
21   disciplined by people services for his
22   involvement in the Mark Dorfman incident.
23       Q.   Do you know whether Adam Gecht was
24   part of that decision making for issuing the
25   discipline for the Mark Dorfman situation?
```

```
 1                   EUROPE
 2       A.    Yes.
 3       Q.    I'm just going to go back to share
 4   the complaint again.
 5             Ms. Europe, if I could just direct
 6   you to paragraph 24 of the complaint, which is
 7   on page 5 of the document.
 8       A.    The paragraph that begins "what is"?
 9       Q.    One up from that, 24.  24 through 26
10   it starts, "As another example, one of the
11   trainers, Martin."
12       A.    Yeah.
13       Q.    So these allegations in paragraphs
14   24, 25, 26 about Martin "M." Melendez and
15   comments that you are alleging that Mr. Maltman
16   made, when did this occur?
17       A.    It occurred frequently, so I
18   couldn't give you a date or an approximate
19   date.
20       Q.    It occurred frequently that
21   Mr. Maltman would refer to Martin Melendez in
22   what you perceived to be inappropriate ways?
23       A.    Yes.
24       Q.    Did you ever escalate this issue to
25   your supervisor?
```

```
 1              EUROPE
 2      A.    No, these issues usually happened in
 3 the presence of Chris Maltman and myself.  It
 4 was rarely with others present, with the
 5 exception of the conversation where he and Jose
 6 were poking fun at Michael Lantino's
 7 transgender partner.
 8      Q.    Did you ever tell Mr. Maltman that
 9 his comments to Melendez were inappropriate?
10      A.    Yes.
11      Q.    And what was his response?
12      A.    He usually kind of took it very
13 lightly.  For example, once I told him when he
14 was making fun of the length of Martin's
15 shorts, again, it was just Chris and I in the
16 office, I told him, you know, he wouldn't
17 complain if someone who was female on the staff
18 was wearing shorts that were that length and
19 he's not indecently exposed so let it go.
20           And at that time and many other
21 times Chris said, yeah, but Martin is just a
22 little bitch.  So, you know, it was
23 conversations like that often.
24      Q.    Did you ever tell Mr. Taveras about
25 those comments?
```

```
                                    Page 151
 1                  EUROPE
 2        A.    No, those comments were never said
 3   to Martin as I recall.  They were said to me in
 4   our office and sometimes when we were on the
 5   gym floor, but it was just the two of us.
 6        Q.    Did Mr. Maltman make comments
 7   directly to Martin that you considered to be
 8   inappropriate?
 9        A.    There were times when I felt the way
10   that he interacted with Martin "M." Melendez
11   were inappropriate interactions and certainly
12   could have been more respectful.
13            I did take issue with him
14   consistently sending Skyy and Martin out for
15   food for the meeting because he never asked any
16   other trainers to do so.  Sometimes other
17   trainers might volunteer, but he never directly
18   went to other trainers to ask them to do that
19   task, so I certainly understood why Martin was
20   upset by that.  Yeah.
21        Q.    Did Martin ever come to you then
22   specifically to complain about Mr. Maltman?
23        A.    Yes, on a number of occasions.
24        Q.    And what did you do with those
25   complaints?
```

Page 152

1                    EUROPE

2        A.    The complaints were rarely that an

3    incident had occurred and that it was something

4    I needed to report to people services.

5    Typically, it was that Martin felt that people

6    were speaking to him disrespectfully.  Jose and

7    Chris Maltman spoke to him disrespectfully and

8    really couldn't find it in themselves to speak

9    to him like he was an adult human.

10       Q.    But you never raised any of Martin's

11   complaints to people services; is that correct?

12       A.    Correct.

13       Q.    Wouldn't that be your role to do

14   that as a supervisor of the department?

15       A.    If it seemed that there was a

16   specific incident, for example, when there was

17   a specific incident where Chris Maltman asked

18   Sabrina if she was autistic, you know, if there

19   was a specific incident, of course, I would go

20   to people services.  But it's hard to go to

21   people services and say my employee feels that

22   these conversations are disrespectful and not

23   have anything to point to.

24             I did, however, recommend that

25   Martin either speak to Jose or people services

```
 1              EUROPE
 2  Cori first called you with the member there
 3  that you heard the member talk?
 4      A.    I heard words come out of the
 5  member's mouth.  I would not say that I heard
 6  the member a hundred percent clearly, but she
 7  asked him a clear question, got a brief
 8  response, and then reiterated that that was the
 9  response.
10      Q.    Were you part of any of the
11  investigative interviews that were conducted
12  about this incident?
13      A.    Not outside of people services
14  asking me specifically what happened on that
15  night, but they didn't ask me about anything
16  else.
17      Q.    Up until you received the discovery
18  in this case is it fair to say you were not
19  aware of what discipline was issued as a result
20  of this incident?
21      A.    Yes.
22      Q.    Is there anyone else you believe
23  should have been disciplined who was not
24  disciplined because of that incident?
25      A.    Sitting in this seat right now, I
```

```
 1                    EUROPE
 2   don't know.  And the reason I don't know is
 3   because I don't know exactly what words were
 4   relayed to Chris Maltman when he was asked to
 5   take care of this member.  If he was asked to
 6   take care of a member whether it was because
 7   Jose thought I wasn't providing good customer
 8   service or thought I wasn't doing my job then,
 9   of course, Chris should have paired that
10   member.
11            If any part of what I complained
12   about initially was related to Chris then,
13   yeah, it's a problem if he didn't resist or go
14   to people services with what the request was.
15   But since I don't know how that responsibility
16   was relayed to him, I would say that everyone
17   that I am aware of that should be disciplined
18   was disciplined.
19       Q.    Just scrolling down a bit to page 12
20   of the document, paragraph 65.
21       A.    Paragraph 65.
22       Q.    Paragraph 65 alleges that at least
23   two other former Equinox employees departed the
24   company during the period of your employment
25   due to race-based hostile work environment at
```

```
                                        Page 309
 1                    EUROPE
 2   work based on race and to have that person act
 3   as though they cared, and then ask my white
 4   subordinate to take care of this.
 5              I mean, I was really -- I was
 6   appalled and disgusted and hurt, and it was
 7   really dehumanizing and I feel -- yes, it's
 8   upsetting to even talk about it.
 9       Q.    And did this dehumanizing experience
10   and/or others like it at Equinox trigger your
11   eating disorder as well?
12       A.    Yes, it increased how often I binged
13   and purged, whether it was bigger binges at
14   night or more frequent binges and purges during
15   the day, especially if something had just
16   occurred, it's pretty likely that I was going
17   to binge immediately afterwards.
18              MS. LIEDERMAN:  Okay.  Thanks no
19        further questions.
20              MR. ZOLDESSY:  I have just a few
21        follow up.  It will be brief.
22   FURTHER EXAMINATION
23   BY MR. ZOLDESSY:
24       Q.    Ms. Europe, with respect to the
25   coffee shop incident, if I understand
```

1                          EUROPE

2     correctly, you testified earlier that you never

3     reported this to people services or any of your

4     supervisors; is that correct?

5          A.    Yes.

6          Q.    I'm sorry is that a "yes"?

7          A.    It's a yes.

8          Q.    So is there any way that anyone

9     above you at Equinox would have knowledge about

10    that incident if you didn't tell them about it?

11         A.    Not necessarily.  I mean, I

12    certainly discussed it with Raj because Raj and

13    I discussed our day-to-day experiences pretty

14    regularly.  And I know that Raj did go to

15    people services about his negative interactions

16    with Chris Maltman, but as far as me contacting

17    people services about that particular incident,

18    no, they wouldn't have heard it from me.  I

19    don't know if they heard it from anyone else.

20         Q.    But would you agree that if there is

21    anyone who was in a position to report that to

22    people services it would have been you; is that

23    correct?

24         A.    Yes.

25         Q.    Bear with me for one second.

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    CASE NO. 20-cv-7787
     -------------------------------------X
4
     ROBYNN EUROPE,
5
                         Plaintiff,
6
               vs.
7
     EQUINOX HOLDINGS, INC.
8    d/b/a EQUINOX FITNESS CLUB,
     EQUINOX EAST 92nd STREET, INC.,
9    JOSE TAVERAS, individually,
     CHRISTOPHER MALTMAN, individually,
10   and ADAM GECHT, individually,
11                       Defendants.
12   -------------------------------------X
13                   VOLUME II
14
15
16                   August 26, 2021
17                   9:04 a.m.
18
19        Deposition of ROBYNN EUROPE, held
20   via Virtual Zoom, New York, New York,
21   pursuant to Court Order, before Wendy D.
22   Boskind, a Registered Professional
23   Reporter and Notary Public of the State
24   of New York.
25

```
                                        Page 16

 1                    Europe

 2    times.

 3         A.    Yes.

 4         Q.    The coffee shop incident that

 5    you testified to, with respect to Chris

 6    Maltman speaking to the barista, did you

 7    report that coffee shop incident to Adam

 8    Gecht?

 9         A.    No.

10         Q.    At your deposition, you

11    testified that Mr. Maltman commented on

12    the appearance of members at the gym.

13              Do you recall that?

14         A.    Yes.

15         Q.    Did you report Mr. Maltman's

16    comments to Adam Gecht?

17         A.    No.

18         Q.    At your deposition, you

19    testified on how Mr. Maltman commented on

20    the appearance of a Trans woman.

21              Did you report Mr. Maltman's

22    comment to Adam Gecht?

23         A.    No.

24         Q.    Did you ever speak to Adam

25    Gecht about you not agreeing with
```

Page 18

```
 1                     Europe
 2  floor, and Adam specifically interacted
 3  with Jose, whose office was on the first
 4  floor.
 5          Q.    When you worked at the club,
 6   did you have Adam Gecht's cellphone
 7   number?
 8          A.    Oh, good question.
 9                I don't remember.  Maybe?  I
10  think so?
11          Q.    Do you recall ever speaking
12   to Adam on the telephone?
13          A.    Uh -- yes, I think I spoke to
14  him on my office phone -- yes -- I'm
15  going to go with yes on that, but I'm not
16  sure.
17          Q.    Did you speak to Adam on the
18   club floor?
19          A.    Yes.
20          Q.    Did you ever have one-on-one
21   communications with Adam?
22          A.    Yes.
23          Q.    How would you describe your
24   professional relationship with Adam
25   Gecht, when you were working at the club?
```

```
                                    Page 19
                         Europe
 1
 2          A.     I found Adam to be the --
 3    hmm -- that's a tough question -- um --
 4    I -- it was a professional
 5    relationship -- um -- I wouldn't say that
 6    we were friends, but we didn't butt heads
 7    at all.
 8               He was, as I recall, a good
 9    resource to go to, with regards to
10    navigating my own position within the
11    club.
12               As I recall, his advice was,
13    typically, the sort of advice that I
14    would probably, you know, give anyone who
15    asked me for advice, which was:  Do your
16    job, advocate for yourself, make sure
17    that your job gets done, so you don't
18    have to worry about too much else.
19          Q.     That's good advice.
20               You testified that Jose
21     Taveras was the first person who brought
22     to your attention that your time and
23     attendance was struggling, and you needed
24     to improve your punctuality.
25               After you received a ROD, for
```

Page 28

```
 1                    Europe
 2        Q.    Did you ever complain to Adam
 3   Gecht that you believed you were being
 4   discriminated based on your sex?
 5        A.    I complained to Adam Gecht
 6   that I thought that going to H.R. with
 7   some frequency would be a reason that I
 8   might have been targeted, particularly
 9   following my second ROD.  So, I mean, I
10   guess in a way.
11        Q.    Well, let's break that
12   question down a bit.
13              I heard your testimony, that
14   you told Adam Gecht that you went to H.R.
15   often and you believed that that was the
16   reason why you were issued an ROD.
17              Did I articulate that
18   properly?
19        A.    Yes.
20        Q.    Now I'm going to ask you my
21   question again.
22              Did you ever go to Adam Gecht
23   and tell him that you were being
24   discriminated based on your sex, the fact
25   that you are a female?
```

Page 29

1                    Europe
2          A.     No, not in those words.
3          Q.     Did you ever go to Adam Gecht
4     and tell him that you believed you were
5     being discriminated based on your race?
6          A.     Again, not in those words.
7          Q.     Same question, but did you
8     ever complain to Adam Gecht that you
9     believed you were being discriminated
10    based on your disability?
11         A.     I don't recall discussing
12    that with Adam at all.
13         Q.     And, as you sit here today,
14    is it your testimony that Adam Gecht has
15    been named in this lawsuit because he
16    supervises Jose Taveras?
17              MS. LIEDERMAN:   Objection.
18              You can answer.
19         A.     That is not the only reason,
20    but it is, certainly, one of the reasons.
21         Q.     What's the other reason why
22    Adam Gecht is named as a Defendant in
23    this case?
24         A.     I did mention to Adam that I
25    was concerned that I was being written up