UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBYNN EUROPE,

                    Plaintiff,

      - against -

EQUINOX HOLDINGS, INC., ET AL.,

                    Defendants.

20-cv-7787 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiff, Robynn Europe, brought this action against Equinox Holdings, Inc., Equinox East 92nd Street, Inc. (together, "Equinox" or the "corporate defendants"), and three Equinox employees, Jose Taveras, Christopher Maltman, and Adam Gecht. The plaintiff, a Black woman, claims that she was subjected to employment discrimination on the basis of her sex, race, and disability and retaliation in violation of federal and state law. The defendants[1] now move for summary judgment dismissing all of the plaintiff's claims. For the following reasons, the defendants' motion is **granted in part and denied in part**.

---

[1] There is no record of service of the summons and complaint on Jose Taveras and he has not appeared in this action. All references to "defendants" in this Memorandum Opinion and Order exclude Jose Taveras. The current motion is made on behalf of the remaining defendants.

**I.**

The following facts are based on the parties' Local Civil Rule 56.1 statements and supporting papers and are undisputed unless otherwise noted. See Defendants' Rule 56.1 Statement, ECF No. 83 ("Defs.' 56.1"); Plaintiff's Response to Defendants' Rule 56.1 Statement, ECF No. 91 ("Pl.'s 56.1 Response"); Plaintiff's Rule 56.1 Counter Statement, ECF No. 91, at 18 ("Pl.'s 56.1 Counter Statement").

**A.**

Equinox operates 37 fitness clubs across New York City. Defs.' 56.1 ¶ 1. The plaintiff was hired as a Fitness Manager at Equinox's East 61st Street club in November 2018. Id. ¶¶ 5, 15. In December 2018, the plaintiff was transferred to Equinox's East 92nd Street club as a Personal Training Manager. Id. ¶ 16. In that role, the plaintiff supervised fitness managers, including defendant Christopher Maltman. Id. ¶¶ 17, 19. The plaintiff was supervised by defendant Jose Taveras, a General Manager with Equinox. Id. ¶ 18. Defendant Adam Gecht served as a Regional Director at Equinox and visited the 92nd Street club once or twice per week. Id. ¶ 32.

Equinox maintained a policy on Attendance and Punctuality in its Employee Handbook, which the plaintiff received and read upon the start of her employment in November 2018. Id. ¶¶ 5, 7; Pl.'s Dep., Orzick Decl. Ex. 4, ECF No. 89-4, at 64. The policy

stated that: "Routinely reporting to work late and failing to
work your scheduled hours are violations of Equinox policy that
can result in termination." Zoldessy Decl. Ex. L, ECF No. 82-12,
at 16; see also Defs.' 56.1 ¶ 8; Pl.'s Dep. at 65. Gecht
testified that timeliness was important for general managers,
such as Taveras, and for personal training managers, such as the
plaintiff. Gecht Dep., Orzick Decl. Ex. 6, ECF No. 89-6, at 100.

The defendants maintain that the company expected every
employee to check in when they arrived for work. Defs.' 56.1
¶ 40. The plaintiff concedes this, Pl.'s Dep. at 87, but claims
that many managers did not scan into work on certain workdays
because the reception desk at which employees were meant to scan
in was inconveniently located in relation to the elevator. See
Pl.'s 56.1 Counter Statement ¶¶ 2-5. Thus, the plaintiff
maintains that, while Equinox's attendance records accurately
captured when the plaintiff scanned into the building, those
records do not reflect the times when the plaintiff arrived in
the building or started work. Pl.'s Dep. at 73-74.

On April 15, 2019, the plaintiff received a disciplinary
Record of Discussion ("ROD"). Zoldessy Decl. Ex. M, ECF No. 82-
13. The ROD, which was signed by Taveras, stated that the
plaintiff had been late for work nine times in the previous
fifteen days. Id. The ROD also stated that the potential
consequences for continued unsatisfactory performance issues

3

included termination. Id.[2] The plaintiff does not know whether
Gecht was involved in the preparation of the April 2019 ROD.
Defs.' 56.1 ¶ 68. The defendants contend that the plaintiff
understood that her timeliness had to improve. Defs.' 56.1 ¶ 45.
In the response section of the April 2019 ROD, the plaintiff
wrote: "I understand that lateness is an issue," and she did not
allege discriminatory or retaliatory treatment. ECF No. 82-13.
Nonetheless, the plaintiff maintains that, after receiving the
April 2019 ROD, she was not concerned that her employment status
was in jeopardy because other employees, including Taveras, were
often late without facing disciplinary consequences. Pl.'s Dep.
at 75. In June 2019, the plaintiff received an "ROD final
warning" regarding, among other things, attendance issues.
Zoldessy Decl. Ex. O, ECF No. 82-15.

In April 2019, Taveras was also issued an ROD and counseled
by Gecht regarding time and attendance. Defs.' 56.1 ¶ 64; Gecht
Dep. at 157. The defendants contend that Taveras's attendance
was monitored and that Gecht was satisfied by Taveras's
improvement. Defs.' 56.1 ¶ 65. The plaintiff contends that
Taveras's lateness actually worsened after he received an ROD.
Pl.'s 56.1 Response ¶ 65.

---

[2] The plaintiff also concedes that she was informally counseled by Taveras
about her lateness before she received an ROD. Pl.'s Dep. at 69-70.

### B.

The plaintiff claims that, over the course of the plaintiff's employment, Maltman engaged in inappropriate conduct that made the plaintiff uncomfortable. Maltman often commented on the appearance of Black female members of the gym. Pl.'s Dep. at 56. In particular, Maltman remarked to the plaintiff that one Black female member of the gym "was so hot" and "[t]hat she had big tits." Id. at 56-57. Of a transgender woman gymgoer, Maltman commented that Maltman "could not believe that a member of our staff was dating her, and then that she was very hot considering she was a man." Id. at 59. Taveras was present when these latter comments were made. Id.

On one occasion, Maltman asked the plaintiff to accompany him to a coffee shop during work hours so that he could ask out a young barista there, who was Black. Id. at 49. The plaintiff contends that Maltman sought the plaintiff's presence as a Black woman to legitimize Maltman in the barista's eyes and make the barista more receptive to Maltman's advances. Id. at 51-55; 299-302. The plaintiff never complained to a supervisor or to Equinox's People Services Department about the coffee shop incident. Defs.' 56.1 ¶ 27.

The plaintiff testified that Maltman never directed any harassing, discriminatory, or retaliatory conduct toward the plaintiff personally, Pl.'s Dep. at 48, and the defendants

5

contend that Maltman and the plaintiff had a professional and cordial working relationship, Defs.' 56.1 ¶ 23. However, the plaintiff testified that she had several "inappropriate interactions" with Maltman, usually concerning other people, that made the plaintiff uncomfortable. Pl.'s Dep. at 49. The plaintiff also declared that Maltman told the plaintiff repeatedly that the plaintiff "should not be his supervisor," and that Maltman made "objectifying and denigrating comments to [the plaintiff] and [her] colleagues about women's sexuality and their bodies." Europe Decl., ECF No. 89-1 ¶ 13. The plaintiff raised with Taveras the difficulties that the plaintiff had working with and supervising Maltman. Pl.'s Dep. at 47–48.

In May or June 2019, the plaintiff contacted Equinox's Regional Director of People Services, Stephanie Herrmann, seeking a disability accommodation. Id. at 43–44. The plaintiff's accommodation requests were granted. Defs.' 56.1 ¶ 94. Taveras, Maltman, and Gecht did not know of the nature of the plaintiff's disability or the reason that she requested an accommodation. Id. ¶¶ 95–96.

### C.

On June 4, 2019, a customer requested to be paired specifically with a white male trainer, and this request was forwarded to the plaintiff. Orzick Decl. Ex. 18, ECF No. 89-18. On June 5, 2019, the plaintiff emailed Taveras to lodge a

complaint about the incident.[3] Id. Ex. 19, ECF No. 89-19, at 3-4.
The plaintiff's email expressed concern that, by accommodating
the customer's request, the company "would be more concerned
with the dollars a member spends, than making sure that people
of color can exist in a non-hostile work environment." Id. at 4.
On June 7, 2019, the plaintiff sent an email to Equinox
employees, including Taveras and Maltman, complaining that
Equinox appeared to have acquiesced to the customer's request.
Orzick Decl. Ex. 22, ECF No. 89-22.

On June 5, 2019, the plaintiff received her ROD final
warning, which documented continued lateness on the part of the
plaintiff and noted that the plaintiff had "shown challenges
with effective accountability and communication with the team."
Zoldessy Decl. Ex. O, ECF No. 82-15. The ROD identified fourteen
occasions in May 2019 on which the plaintiff had been late for
work. Id. The plaintiff wrote in the response section of the ROD
that she believed she was the "only one being reprimanded," even
though other employees, including Maltman and Taveras, were
often late without facing repercussions. Id.

Gecht testified to being concerned that the timing of
issuing the June 2019 ROD soon after the plaintiff complained
about the white trainer incident might create the appearance of

---

[3] As the parties did in their briefs, see, e.g., ECF No. 81, at 6, the Court
will refer to this incident as the "white trainer" incident.

being retaliatory, but Gecht maintained that the white trainer incident had "nothing to do with" the June 2019 ROD. See Gecht Dep. at 70–73. Gecht discussed the timing of the ROD with the plaintiff and conveyed to her that the ROD and the white trainer incident were unrelated. Id. at 72. The defendants claim that Equinox began preparing the June ROD prior to the white trainer incident. See Defs.' 56.1 ¶ 76; Gecht Dep. at 69–70. The plaintiff argues that the June 2019 ROD was retaliatory. Pl.'s 56.1 Response ¶ 76.

Also on June 5, 2019, Maltman was involved in an incident with another Equinox trainer, Sabrina McGeary, in which Maltman made comments that McGeary felt were inappropriate. Orzick Decl. Ex. 16, ECF No. 89-16. Maltman allegedly told McGeary that she looked like another woman, commented on McGeary's leggings, and asked McGeary if she was autistic. Defs.' 56.1 ¶ 30. The plaintiff contends that there were sexual and racial connotations to Maltman's comments to McGeary because the comments implied that McGeary must be related to another brown-skinned woman with curly hair and that Maltman commented not only on McGeary's leggings but also how her body looked in the leggings. Pl.'s 56.1 Response ¶ 30. Gecht was present at the meeting at which Maltman made these comments. Defs.' 56.1 ¶ 34. Gecht testified that, after the meeting, Gecht reprimanded Maltman with respect to the autism comment. Gecht Dep. at 52–53.

The plaintiff maintains that Gecht only reprimanded Maltman after the plaintiff lodged a formal complaint and People Services substantiated the incident. Pl.'s 56.1 Response ¶ 34. McGeary emailed the plaintiff on the day of the incident to complain about Maltman's comments. See ECF No. 89-16.

On June 7, 2019, Maltman sent a text message to Equinox Regional Director of Personal Training, Michael Caporusso, in which Maltman described the plaintiff as "not very charming" and said that he hoped Caporusso would "appreciate the reference." Orzick Decl. Ex. 24, ECF No. 89-24. Caporusso testified at his deposition that the comment was likely in reference to a video Maltman had previously showed him that referred to a "charming Negress." Id. Ex. 5, ECF No. 89-5, at 68-69. Caporusso never reported this exchange to Equinox. Id. at 75.

On June 10, 2019, the plaintiff reached out to Hermann in People Services, informing Hermann that McGeary had "had a 1-on-1 scheduled with [Maltman] today, and came in early to ask if [the plaintiff] would be present for it so [McGeary] wouldn't be uncomfortable." Orzick Decl. Ex. 16, ECF No. 89-16. The plaintiff also informed Hermann that "there has been a lot of tension building at the club that seems unresolved. [McGreary] comes to me about it constantly, and . . . I have been witness to countless inappropriate racial comments." Id. People Services conducted an investigation. Defs.' 56.1 ¶ 77.

9

On June 11, 2019, the Equinox membership advisor involved in the white trainer incident was issued an ROD. ECF No. 89-18. On June 14, 2019, Taveras was also issued an ROD for his role in the white trainer incident. Zoldessy Decl. Ex. R, ECF No. 82-18. Taveras's ROD was signed by Gecht. Id.

On June 14, 2019, Maltman was issued an ROD in connection with the McGeary incident. Orzick Decl. Ex. 17, ECF No. 89-17; Maltman Dep., id. Ex. 7, ECF No. 89-7, at 46-48. Citing the Equinox investigation report, the plaintiff argues that Maltman was only disciplined for asking McGeary if she was autistic and not on grounds of race- or sex-based discrimination. Pl.'s 56.1 Response ¶ 31; ECF No. 89-17.

### D.

The parties dispute the quality of the plaintiff's work over the course of her employment. The defendants claim that the plaintiff was not completing projects on time or in a satisfactory manner and that the club was losing trainers and clients because of the plaintiff, and attribute the declining financial performance of Equinox's 92nd Street Club to the plaintiff's inattentiveness to the club's clients. See Defs.' 56.1 ¶¶ 36-38; Gecht Dep. at 88-90. The plaintiff states that she was never late for a training appointment with a client, that she never kept a client waiting, and that she regularly

stayed past the end of her shift. Pl.'s 56.1 Counter Statement ¶ 9.

On September 24, 2019, Equinox terminated the plaintiff. Zoldessy Decl. Ex. P, ECF No. 82-16. The Record of Involuntary Separation ("ROIS") issued to the plaintiff identified only lateness as the reason for the plaintiff's termination. Id. The ROIS was signed by an Equinox People Services employee, Paul Kwon. Id.

In the employee comments section of the ROIS, the plaintiff expressed her belief that her firing was biased and reiterated her complaint that other employees, including Taveras, were routinely late to work without facing repercussions. Id. The plaintiff further expressed her belief that she was being targeted because she called attention to "issues" at the club and that a review of other managers' attendance records would reveal disparate treatment. Id.

After her termination, the plaintiff reached out to Kwon to reiterate her allegations of biased treatment. Orzick Decl. Ex. 29, ECF No. 89-29. The plaintiff sent Kwon a list of eleven instances between June 19, 2019 and July 15, 2019 on which the plaintiff believed Taveras had been late for work. Id. Ex. 30, ECF No. 89-30. Kwon forwarded these allegations to Gecht on September 26, 2019. Id. Ex. 31, ECF No. 89-31. Gecht responded

by telling Kwon that Taveras's lateness issues had been addressed and rectified. Id.

In mid-2020, Equinox terminated Taveras. Defs.' 56.1 ¶¶ 66-67. The defendants claim that Taveras's time and attendance record was a factor in the decision to fire him. Id. ¶ 67. The plaintiff disputes this claim. Pl.'s 56.1 Response ¶ 67.

II.

Based on these facts, the plaintiff brings claims for disparate treatment on the basis of sex and race, a hostile work environment based on sex and race, and retaliation for complaining about the foregoing under 42 U.S.C. § 1981; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.; the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL"). The plaintiff also brings claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA").

The Court has subject matter jurisdiction over the plaintiff's claims that arise under federal law pursuant to 28 U.S.C. § 1331. The Court has supplemental subject matter jurisdiction over the plaintiff's claims that arise under state law pursuant to 28 U.S.C. § 1367(a), because the state law claims arise from the same "common nucleus of operative fact" as the claims arising under federal law, such that they "form part

12

of the same case or controversy." See City of Chicago v. Int'l
Coll. of Surgeons, 522 U.S. 156, 165 (1997).[4]

## III.

The standard for granting summary judgment is well
established. "The court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). The moving party bears the initial burden
of "informing the district court of the basis for its motion"
and identifying the materials in the record that "it believes
demonstrate the absence of a genuine issue of material fact."
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). At the
summary judgment stage, the court must resolve all ambiguities
and draw all reasonable inferences against the moving party. See
Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475
U.S. 574, 587 (1986). "Only disputes over facts that might
affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving
party meets its burden, the nonmoving party must produce
evidence in the record and "may not rely simply on conclusory
statements or on contentions that the affidavits supporting the

---

[4] Unless otherwise noted, this Memorandum Opinion and Order omits all
alterations, citations, footnotes, and internal quotation marks in quoted
text.

motion are not credible." <u>Ying Jing Gan v. City of N.Y.</u>, 996
F.2d 522, 532 (2d Cir. 1993).

**IV.**

**A. Claims Against the Corporate Defendants**

The plaintiff alleges disparate treatment on the basis of
race and sex, a hostile work environment based on race and sex,
and retaliation for reporting racial and sexual discrimination.
The plaintiff identifies as a Black woman. Compl. ¶ 3. The
plaintiff advances each of these claims under 42 U.S.C. § 1981,
Title VII, the NYSHRL, and the NYCHRL. All of these claims are
brought against the corporate defendants. For the following
reasons, under each of these statutes, the plaintiff's disparate
treatment and hostile work environment claims survive, and the
plaintiff's retaliation claims fail.[5]

**1. Disparate Treatment**

The plaintiff brings a disparate treatment claim under
§ 1981.[6] At the summary judgment stage, claims under § 1981 "are

---

[5] The plaintiff also brought claims under the ADA. The defendants moved for
summary judgment as to those claims, and the plaintiff did not respond to
those arguments or address the ADA claims in her opposition brief. "Federal
courts may deem a claim abandoned when a party moves for summary judgment on
one ground and the party opposing summary judgment fails to address the
argument in any way." <u>Cowan v. City of Mt. Vernon</u>, 95 F. Supp. 3d 624, 645
(S.D.N.Y. 2015). Accordingly, the plaintiff's ADA claims are abandoned, and
the defendants' motion for summary judgment is **granted** as to the plaintiff's
ADA claims.

[6] "Although § 1981 does not itself 'specifically authorize private lawsuits to
enforce' its prohibitions, the Supreme Court has 'created a judicially
implied private right of action.'" <u>Rubert v. King</u>, No. 19-cv-2781, 2020 WL
5751513, at *6 (S.D.N.Y. Sept. 25, 2020) (quoting <u>Comcast Corp. v. Nat'l
Ass'n of African Am.-Owned Media</u>, 140 S. Ct. 1009, 1015 (2020)).

governed by the McDonnell Douglas burden-shifting framework."
Gueye v. People's United Bank, Nat'l Ass'n, No. 21-1250, 2022 WL
2203953, at *1 (2d Cir. June 21, 2022); see McDonnell Douglas
Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the
plaintiff bears the initial burden of establishing a prima facie
case of discrimination. See Tolbert v. Smith, 790 F.3d 427, 435
(2d Cir. 2015). In the context of a disparate treatment claim,
that prima facie case comprises the following elements: "(i)
[the plaintiff] maintain[ed] a protected status; (ii) [the
plaintiff] suffered an adverse employment action; and (iii) the
adverse action . . . occurred under circumstances giving rise to
an inference of discrimination based on [the plaintiff's]
membership in the protected class." De La Pena v. Metro. Life
Ins. Co., 953 F. Supp. 2d 393, 409-10 (E.D.N.Y. 2013), aff'd,
552 F. App'x 98 (2d Cir. 2014). If the plaintiff establishes her
prima facie case, "[t]he burden then shifts to the employer to
articulate some legitimate, nondiscriminatory reason for the
disparate treatment. If the employer articulates such a reason
for its actions, the burden shifts back to the plaintiff to
prove that the employer's reason was in fact pretext for
discrimination." Bell v. SL Green Realty Corp., No. 19-cv-8153,
2022 WL 2819054, at *2 (S.D.N.Y. July 19, 2022). The plaintiff
must show that her protected status was the but-for cause of her
termination. See Comcast Corp. v. Nat'l Ass'n of African Am.-

Owned Media, 140 S. Ct. 1009, 1014, 1019 (2020); Rubert v. King,
No. 19-cv-2781, 2020 WL 5751513, at *6 (S.D.N.Y. Sept. 25,
2020).

The defendants do not dispute that the plaintiff is a
member of a protected class or that the plaintiff's termination
constituted an adverse action. However, the defendants argue
that the plaintiff has not met her prima facie burden because
she has not shown circumstances giving rise to an inference of
discrimination and, in any event, the plaintiff has not shown
that Equinox's non-discriminatory reason for terminating the
plaintiff, namely, the plaintiff's lateness, was pretextual.

"A plaintiff may support an inference of race
discrimination by demonstrating that similarly situated
employees of a different race were treated more favorably."
Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d. Cir.
1999); see also Littlejohn v. City of N.Y., 795 F.3d 297, 312
(2d Cir. 2015) ("An inference of discrimination can arise from
circumstances including . . . the more favorable treatment of
employees not in the protected group[.]"). Employees are
similarly situated if they are "subject to the same performance
evaluation and discipline standards" and "engaged in comparable
conduct." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir.
2000). The employees' circumstances need only be "reasonably
close," id., and the employees need not be of the exact same

rank, Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 109 n.7
(2d. Cir. 2010). "In addition to identifying similarly situated
employees who are subject to the same performance evaluation and
discipline standards, a plaintiff must also show that those
employees engaged in acts of comparable seriousness but were not
punished as severely as plaintiff." Risco v. McHugh, 868 F.
Supp. 2d 75, 100 (S.D.N.Y. 2012).

In this case, there is evidence that Equinox's expectations
for the plaintiff and Taveras with respect to timeliness were
the same. There is also a factual dispute as to whether Taveras
was late as frequently as the plaintiff, especially in light of
the plaintiff's testimony regarding the accuracy of the swipe-
card records. Accordingly, a reasonable jury could find that
Taveras and the plaintiff were similarly situated.

There is also evidence that Taveras and the plaintiff were
not disciplined comparably for their comparable conduct. In
light of the evidence that Taveras was disciplined later and
less frequently than the plaintiff, a reasonable jury could
conclude that the two employees were treated differently under
similar circumstances because of their race. See, e.g., Wilkins
v. United Parcel Serv., Inc., No. 19-cv-8180, 2022 WL 597431, at
*8 (S.D.N.Y. Feb. 28, 2022). Accordingly, the plaintiff has
shown circumstances giving rise to an inference of
discrimination and the plaintiff has met her prima facie burden.

17

The plaintiff's prima facie showing is buttressed by evidence of a discriminatory environment, which supports an inference of discrimination. For example, there is evidence that Maltman referred to non-white staff as lazy and untrustworthy, and said that he wanted to get them fired. See Europe Decl. ¶ 13; cf. Eka v. Brookdale Hosp. Med. Ctr., 247 F. Supp. 3d 250, 266 (E.D.N.Y. 2017). There is also evidence that Maltman made inappropriate comments about Black women's bodies and that Equinox accommodated a client's racial preference.[7] These incidents are evidence of a discriminatory environment and support the plaintiff's claim that her disparate treatment was due to her membership in a protected class. See Littlejohn, 795 F.3d at 312 ("An inference of discrimination can arise from circumstances including . . . [the employer's] invidious comments about others in the employee's protected group[.]").

The plaintiff does not dispute that the defendants have proffered a legitimate, non-discriminatory reason for her

---

[7] The defendants argue that Maltman's comments are "stray remarks" that are not probative of discrimination. However, the remarks were plainly discriminatory, and although Maltman was the plaintiff's supervisee, there is evidence that Maltman made discriminatory comments in the presence of Taveras and Gecht, who the jury could conclude were decision-makers with respect to the plaintiff's termination. See Eka, 247 F. Supp. 3d at 266. Moreover, although stray remarks by themselves cannot prove a claim of employment discrimination, "when other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001). Accordingly, the jury could consider these remarks – in conjunction with the evidence that the plaintiff was disciplined more swiftly and more severely than Taveras for similar conduct – in support of a finding of discrimination.

termination, namely, her lateness, and that the burden shifts
back to the plaintiff under the McDonnell Douglas framework.
However, for substantially the same reasons that the plaintiff
has met her prima facie burden, the plaintiff has shown a
factual dispute as to whether her lateness was a pretext for
discrimination. See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834,
847 (2d Cir. 2013) ("[A] plaintiff may rely on evidence
comprising her prima facie case . . . together with other
evidence such as inconsistent employer explanations, to defeat
summary judgment at [the pretext] stage.").

The plaintiff has presented evidence of a discriminatory
environment and evidence that her documented lateness did not
reflect her actual arrival times. The plaintiff has also shown
that Taveras was not disciplined as much or as promptly as the
plaintiff for his lateness. These inconsistencies support a
finding of pretext. See Zann Kwan, 737 F.3d at 846 ("A plaintiff
may prove that retaliation was a but-for cause of an adverse
employment action by demonstrating weaknesses, implausibilities,
inconsistencies, or contradictions in the employer's proffered
legitimate, nonretaliatory reasons for its action. From such
discrepancies, a reasonable juror could conclude that the
explanations were a pretext for a prohibited reason.").

Accordingly, the plaintiff has raised a material factual
dispute with respect to whether the corporate defendants' reason

for the plaintiff's termination was a pretext for discrimination. Summary judgment is therefore **denied** as to the § 1981 claim for disparate treatment.[8]

The plaintiff also brings disparate treatment claims under Title VII, the NYSHRL, and the NYCHRL. The requirements for a disparate treatment claim under § 1981 and Title VII are similar, see Tolbert, 790 F.3d at 434, except that the degree of causation required for a Title VII claim for disparate treatment is lower: a plaintiff need only show that the protected characteristic was a motivating factor in the adverse action or hostile work environment, see Naumovski v. Norris, 934 F.3d 200, 213 (2d Cir. 2019). Accordingly, the plaintiff's disparate treatment claim under Title VII survives for the same reasons as the plaintiff's disparate treatment claim under § 1981.[9] The

---

[8] Although "the precise contours of supervisory liability in the § 1981 context are unsettled," Rubert, 2020 WL 5751513, at *10, the defendants do not raise any arguments about whether the conduct of the employees at issue in this case can be imputed to Equinox. The Court will not consider this issue sua sponte. See id.

[9] Section 1981 "only concerns discrimination on the basis of race." Kitani v. N.Y.C. Transit, No. 19-cv-1043, 2022 WL 874781, at *10 n.9 (S.D.N.Y. Mar. 24, 2022). However, in this case, the evidence of race-based treatment substantially overlaps with the evidence of sex-based treatment. Accordingly, while the plaintiff has no sex-based claims under § 1981, to the extent that her race-based claims survive under Title VII, the NYSHRL, and the NYCHRL, her sex-based claims also survive under those statutes.

plaintiff's disparate treatment claims under the NYSHRL[10] and NYCHRL[11] also survive for the same reasons.

## 2. Hostile Work Environment

The plaintiff next alleges employment discrimination based on a hostile work environment. Such claims are not governed by

___

[10] "In August 2019, the NYSHRL was amended to direct courts to construe the NYSHRL, like the NYCHRL, 'liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed.'" Bueno v. Eurostars Hotel Co., S.L., No. 21-cv-535, 2022 WL 95026, at *8 (S.D.N.Y. Jan. 10, 2022) (quoting N.Y. Exec. Law § 300); see also McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020). Prior to the 2019 amendments to the NYSHRL, employment discrimination claims under the NYSHRL were evaluated under the same standards that govern Title VII claims. See Xiang v. Eagle Enters., LLC, No. 19-cv-1752, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020). Although the 2019 amendments were signed into law on August 12, 2019, the amendments have different effective dates. See S. 6577, 242d Leg. § 16 (N.Y. 2019). And while courts agree that the amendments do not apply retroactively, courts have arrived at different conclusions with respect to the amendments' effective dates. Compare McHenry, 510 F. Supp. 3d at 68 ("The amendment [directing courts to construe the NYSHRL liberally] took effect on the signing date, August 12, 2019, although other parts of the omnibus bill containing it took effect on October 11, 2019."); with Wray v. Westchester Med. Ctr. Advanced Physician Servs., P.C., No. 21-cv-394, 2022 WL 3214924, at *8 n.10 (S.D.N.Y. Aug. 9, 2022) ("the NYSHRL was amended, effective October 11, 2019"), and Wellner v. Montefiore Med. Ctr., No. 17-cv-3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019) ("these amendments [to the NYSHRL] only apply to claims that accrue on or after the effective date of October 11, 2019."). Moreover, the 2019 amendments may not apply to the plaintiff's claims at all because the sections of the law that appear to be potentially relevant "only apply to claims filed under such sections on or after the effective date of such sections," S. 6577 § 16(d), and the plaintiff's Complaint was filed on September 22, 2020. At this stage, the Court does not need to determine the effect, if any, of the 2019 amendments on the plaintiff's NYSHRL claims because the plaintiff's discrimination and hostile work environment claims against the corporate defendants survive summary judgment under Title VII standards, which were the same as the pre-amendment NYSHRL standards. In any pretrial motions, or together with the parties' proposed requests to charge, the parties should address the issue of whether any of the 2019 amendments to the NYSHRL apply to the plaintiff's remaining claims and, if so, what the appropriate standard is for the jury to apply to claims under the NYSHRL.

[11] "The NYCHRL uses the same framework as Title VII and the NYSHRL, but contains, as to some elements, more liberal pleading and proof standards." Pollock v. Shea, 568 F. Supp. 3d 500, 511 (S.D.N.Y. 2021); see also Lapaix v. City of N.Y., No. 13-cv-7306, 2014 WL 3950905, at *9 (S.D.N.Y. Aug. 12, 2014). Therefore, because the plaintiff's disparate treatment claims under Title VII survive, her claims under the NYCHRL also survive.

the McDonnell Douglas burden-shifting framework. See, e.g.,

Spence v. Bukofzer, No. 15-cv-6167, 2017 WL 1194478, at *6

(S.D.N.Y. Mar. 30, 2017). Hostile work environment claims under

§ 1981 and Title VII are governed by the same standard. See

Littlejohn, 795 F.3d at 320; Whidbee v. Garzarelli Food

Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000); Spence, 2017

WL 1194478, at *6. "In order to prevail on a hostile work

environment claim, a plaintiff must make two showings: (1) that

the harassment was sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive

working environment and (2) that there is a specific basis for

imputing the conduct creating the hostile work environment to

the employer." Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d

Cir. 2013). "[T]he plaintiff also must show that the hostile

conduct occurred because of a protected characteristic."

Tolbert, 790 F.3d at 439.

      The defendants do not address whether, if there was a

hostile work environment, the conduct creating that environment

can be imputed to Equinox. The defendants only argue that the

conditions experienced by the plaintiff were not so severe as to

constitute a hostile work environment. The defendants' argument

is unpersuasive.

      "As a general rule, incidents must be more than episodic;

they must be sufficiently continuous and concerted in order to

22

be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Id.; see also Lamarr-Arruz v. CVS Pharmacy, Inc., 271 F. Supp. 3d 646, 656 (S.D.N.Y. 2017) ("Isolated incidents typically will not create a hostile work environment, unless the incidents are so severe that they alter the terms and conditions of employment."). "While a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." Whidbee, 223 F.3d at 70.

In this case, within the span of a few months, there were several incidents that were either racially charged on their face, or else were facially neutral but could be found by a reasonable jury to have been motivated by bias. For example, there is evidence that Maltman often made discriminatory comments in the plaintiff's presence. These included objectifying comments about the bodies of Black women, including comments to McGeary about McGeary's attire and, according to the plaintiff, the way McGeary's body looked in that attire. Pl.'s 56.1 Response ¶ 30. Maltman also suggested that McGeary must be

related to another brown-skinned woman and that an Afro-Latino colleague should carry a client home on his back. Rodriguez Decl., ECF No. 89-2 ¶ 10; Europe Decl. ¶ 18. Maltman also referred to non-white staff as lazy and untrustworthy, and said that he wanted to get them fired. Id. ¶ 13. The plaintiff also reported to a People Services representative that the plaintiff had witnessed "countless inappropriate racial comments." Orzick Decl., Ex. 16, ECF No. 89-16.

While the plaintiff was not the subject of these comments, her awareness of them nonetheless supports her claim that a hostile work environment existed. See Williams v. Consol. Edison Corp. of N.Y., 255 F. App'x 546, 549 (2d Cir. 2007) ("Because a hostile work environment claim focuses on the nature of the workplace environment as a whole, evidence of racial and sexual harassment and hostility beyond what is directed specifically at the plaintiff is relevant to our analysis."); Whidbee, 223 F.3d at 69 ("[B]ecause the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."); Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 327 (N.D.N.Y. 2013) ("Highly offensive, inherently misogynist terms and images may reasonably be interpreted to demean all women, and therefore may dramatically affect an

24

employee's working conditions even when not 'directed' at

her."). Moreover, the plaintiff's supervisors were present when

Maltman made some of these discriminatory comments, and when the

plaintiff complained about Maltman's behavior to Taveras,

Taveras did not take any serious action in response. See Patane

v. Clark, 508 F.3d 106, 114 (2d Cir. 2007) (noting the failure

of the plaintiff's employer to take action in response to

harassing conduct notwithstanding the plaintiff's complaints).

There is also evidence that Equinox accommodated the racial

preferences of a client. A reasonable jury could find that such

pandering enshrined a system of racial division within the

workplace and rendered that workplace substantially hostile for

people of color. Finally, there is evidence that the plaintiff

was the victim of disparate treatment based on sex and race

because she was reprimanded for lateness more than Taveras.

Construing the evidence in the light most favorable to the

plaintiff, there is a sufficient record from which a reasonable

jury could find a hostile work environment. See Whidbee, 223

F.3d at 71 ("[R]easonable jurors may well disagree about whether

these incidents would negatively alter the working conditions of

a reasonable employee. But the potential for such disagreement

renders summary judgment inappropriate."). Therefore, summary

judgment is **denied** as to the § 1981 and Title VII hostile work

environment claims. For the same reasons, summary judgment is

**denied** as to the plaintiff's hostile work environment claims
under the NYSHRL and the NYCHRL.[12]

### 3. Retaliation

Finally, the plaintiff alleges retaliation under § 1981,
Title VII, the NYSHRL, and the NYCHRL. The plaintiff argues that
her termination was retaliation for, among other things, the
plaintiff's complaints to Taveras and Caporusso that she was
being subjected to a hostile work environment and the
plaintiff's complaints about the white trainer incident.

Of all the statutes the plaintiff brings retaliation claims
under, the NYCHRL has the most permissive standard.[13] "[T]o
prevail on a retaliation claim under the NYCHRL, the plaintiff

---

[12] Prior to the 2019 amendments to the NYSHRL, the same standard applied to
hostile work environment claims under the NYSHRL and Title VII, see Tolbert,
790 F.3d at 439, and hostile work environment claims under the NYCHRL were
analyzed under a more permissive standard, see Stryker v. HSBC Sec. (USA),
No. 16-cv-9424, 2020 WL 5127461, at *15 (S.D.N.Y. Aug. 31, 2020). As
discussed above, see supra n.9, the Court does not need to determine the
effect, if any, of the 2019 amendments on the plaintiff's claims because the
plaintiff's discrimination and hostile work environment claims against the
corporate defendants survive summary judgment under Title VII standards,
which were the same as the pre-amendment NYSHRL standards. See also Wray,
2022 WL 3214924, at *11 n.12 ("[A]s Plaintiff pled a plausible Title VII
hostile work environment claim based on race, it stands to reason that she
necessarily pled a plausible race-based NYSHRL hostile work environment claim
under the latter's more liberal standard.").

[13] Before the 2019 amendments to the NYSHRL, "The same standards govern[ed]
retaliation claims under Title VII and the NYSHRL," and "[r]etaliation claims
under the NYCHRL [were] subject to a broader standard than under the NYSHRL
and Title VII." McHenry, 510 F. Supp. 3d at 66-67; see also Stryker 2020 WL
5127461, at *14. Retaliation claims under Title VII and § 1981 are governed
by the same standard. See Littlejohn, 795 F.3d at 315-16; Fouche v. St.
Charles Hosp., 64 F. Supp. 3d 452, 457 (E.D.N.Y. 2014). The Court does not
need to determine the effect, if any, of the 2019 amendments to the NYSHRL on
the plaintiff's retaliation claims because the defendants are entitled to
summary judgment even under the NYCHRL standard, which is the most permissive
standard applicable to the plaintiff's retaliation claims.

must show that she took an action opposing her employer's
discrimination and that, as a result, the employer engaged in
conduct that was reasonably likely to deter a person from
engaging in such action." Mihalik v. Credit Agricole Cheuvreux
N.A., Inc., 715 F.3d 102, 112 (2d Cir. 2013); Stryker, 2020 WL
5127461, at *14. The plaintiff must show that retaliation was a
motivating factor in the employer's conduct. See Forrester v.
Corizon Health, Inc., 752 F. App'x 64, 66 (2d Cir. 2018).

"An employer's continuation of a course of conduct that had
begun before the employee complained does not constitute
retaliation because, in that situation, there is no causal
connection between the employee's protected activity and the
employer's challenged conduct." Bacchus v. N.Y.C. Dep't of
Educ., 137 F. Supp. 3d 214, 247 (E.D.N.Y. 2015). Accordingly,
courts have held that, where discipline began before an
employee's protected activity and the employee's poor
performance continued after the protected activity, the
continuation and even gradual escalation of discipline cannot
support a retaliation claim. See, e.g., id. at 243, 247;
Stryker, 2020 WL 5127461, at *14 ("Because the plaintiff's
performance issues were present before his protected activities
began and because the defendants disciplined the plaintiff
progressively, the plaintiff has not satisfied his burden under
the NYCHRL to demonstrate that retaliation was a motivating

factor in these adverse employment actions."); <u>Cadet-Legros v.</u>
<u>NYU Hosp. Ctr.</u>, 21 N.Y.S.3d 221, 231 (App. Div. 2015) ("After
plaintiff made the complaint, the same type of conduct that had
previously produced final warnings and poor evaluations
continued. A reasonable jury could not conclude that any causal
connection existed between plaintiff's internal complaint and
her discharge.").

In this case, the plaintiff first received an ROD for
lateness in April 2019, and it is undisputed that the plaintiff
was informally counseled by Taveras about her lateness before
that date. Defs.' 56.1 ¶¶ 44-46. The plaintiff's lateness issues
continued after the April 2019 ROD. <u>Id.</u> ¶ 47. The earliest
protected activity cited by the plaintiff occurred in early June
2019 in response to the white trainer incident. <u>See</u> ECF No. 90,
at 5-6, 15. The plaintiff received another ROD for her lateness
in June 2019, which noted that the plaintiff was late to work
fourteen times in May 2019. Defs.' 56.1 ¶¶ 50-51. The plaintiff
continued to tap into work late in August and September 2019.
<u>Id.</u> ¶ 54.[14] In September 2019, the plaintiff was terminated. <u>Id.</u>
¶ 59.

---

[14] Although the plaintiff argues that her check-in time did not correspond
with her actual arrival time, <u>e.g.</u>, Pl.'s 56.1 Response ¶ 54, the plaintiff
was on notice after the April 2019 ROD that her failure to check in to work
on time, regardless of her actual arrival time, would result in discipline.

The plaintiff's termination was therefore the "culmination of continuous progressive discipline," and the evidence does not support a causal connection between the plaintiff's protected activity and her termination. Cadet-Legros, 21 N.Y.S.3d at 230; see also Melman v. Montefiore Med. Ctr., 946 N.Y.S.2d 27, 42 (App. Div. 2012). Because the plaintiff did not remedy her documented lateness issues after engaging in protected activity, there is no evidence that the plaintiff's protected activity motivated her termination. And while the plaintiff argues that the temporal proximity between her protected activity and her termination is sufficient to defeat summary judgment, that temporal proximity is not evidence of retaliation because the defendants began disciplining the plaintiff for her lateness long before she engaged in protected activity. See Bacchus, 137 F. Supp. 3d at 243 ("[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."); see also id. at 247 (explaining that the same reasoning applies to retaliation claims under the NYCHRL).

Accordingly, even construing the evidence in the light most favorable to the plaintiff, the plaintiff has not adduced evidence sufficient to show that her termination was motivated by her protected conduct, and the plaintiff's retaliation claims

under the NYCHRL fail. Because the plaintiff's NYSHRL, Title VII, and § 1981 retaliation claims are governed by equal or more demanding standards, those claims also fail.

## B. Claims Against the Individual Defendants

The plaintiff also brings her claims under the NYSHRL, NYCHRL, and § 1981 against Maltman and Gecht individually on an "aiding and abetting" theory, and against Gecht individually on an "employer" (that is, a direct individual liability) theory.[15]

The defendants argue that the plaintiff's aiding and abetting claims fail because the corporate defendants are not liable for the plaintiff's claims. This is true with respect to retaliation: because the plaintiff was not subjected to retaliation, the individual defendants cannot be liable for retaliation, either under an aiding and abetting theory or an employer theory. Accordingly, summary judgment is **granted** with respect to the plaintiff's retaliation claims against the individual defendants. But, for the reasons explained above, there are material disputes of fact with respect to the plaintiff's disparate treatment and hostile work environment claims. With respect to Maltman, the defendants make no other arguments in support of dismissing the plaintiff's disparate

---

[15] The plaintiff also brought ADA claims against the individual defendants, but the plaintiff abandoned her ADA claims and, in any event, the ADA does not provide for individual liability. See Ingram v. Banks, No. 19-cv-10246, 2022 WL 2702655, at *1 (S.D.N.Y. July 12, 2022); Stryker, 2020 WL 5127461, at *16 n.5.

treatment and hostile work environment claims. Accordingly, the
plaintiff's disparate treatment and hostile work environment
claims as against Maltman survive.[16]

The defendants argue that the plaintiff's NYSHRL and NYCHRL
claims against Gecht fail because the plaintiff cannot connect
any discriminatory or retaliatory conduct to Gecht.

Both the NYSHRL and the NYCHRL provide for aiding and
abetting liability. The NYCHRL makes it "an unlawful
discriminatory practice for any person to aid, abet, incite,
compel or coerce the doing of any of the acts forbidden under
this chapter, or to attempt to do so." N.Y.C. Admin. Code § 8-
107(6). Aiding and abetting claims under the NYCHRL and the
NYSHRL are governed by the same standard. See Xiang v. Eagle
Enters., LLC, No. 19-cv-1752, 2020 WL 248941, at *7 (S.D.N.Y.
Jan. 16, 2020).[17] "Aiding and abetting liability requires that
the aider and abettor share the intent or purpose of the

---

[16] The defendants also do not address the plaintiff's claims under § 1981
against the individual defendants. This is perhaps a result of the misleading
way in which these claims were pleaded: the Complaint labels the § 1981
claims as being asserted against only "the corporate defendants," although
other claims are labeled as being asserted against "all defendants." See
Compl., at 15-16. However, the text of the Complaint makes clear that the
plaintiff's § 1981 claims also are asserted against the individual
defendants. See id. ¶¶ 91-92, 98-99. Accordingly, the plaintiff's § 1981
disparate treatment and hostile work environment claims against the
individual defendants survive, but, if the defendants have arguments in
support of dismissal of those claims that were not raised in this motion for
summary judgment, then the defendants may assert those arguments in a new
motion for summary judgment.

[17] The NYSHRL makes it unlawful "for any person to aid, abet, incite, compel
or coerce the doing of any of the acts forbidden under this article, or
attempt to do so." N.Y. Exec. Law § 296(6).

principal actor, and there can be no partnership in an act where
there is no community of purpose." Id. at *6; see also McHenry,
510 F. Supp. 3d at 68. In this case, the plaintiff has adduced
no evidence that Gecht acted with the intent to discriminate
against or harass the plaintiff. To the contrary, the record
reflects that Gecht reprimanded Taveras for his handling of the
white trainer incident and reprimanded Maltman for at least some
of his discriminatory comments. See Defs.' 56.1 ¶¶ 34, 78. The
plaintiff also testified that she interacted with Gecht in a
"cordial way." Pl.'s 56.1 Response ¶ 33. Accordingly, the
plaintiff has not shown that Gecht acted with the intent to
discriminate against the plaintiff or create a hostile work
environment, and Gecht cannot be held liable under the NYSHRL or
the NYCHRL under an aiding and abetting theory.

The NYSHRL and the NYCHRL also provide for direct
individual liability. Under the NYSHRL, N.Y. Exec. Law § 296(1),
"[a]n individual defendant is liable as an 'employer' . . . when
that individual has an ownership interest in the relevant
organization or the power to do more than carry out personnel
decisions made by others, i.e., the power to hire or fire."
Xiang, 2020 WL 248941, at *5. The NYCHRL provides for individual
liability for employers. See Xiang, 2020 WL 248941, at *6. There
is a dispute of fact as to whether Gecht, a Regional Director at
Equinox, had the power to terminate the plaintiff. With respect

to the plaintiff's disparate treatment claim, the defendants have acknowledged that Gecht was involved in the decision to terminate the plaintiff. See ECF No. 89-25, at 10 of 16. Accordingly, Gecht may be an employer under the NYSHRL and NYCHRL.

However, to establish individual liability under the NYSHRL, the plaintiff also must show that the defendant "actually participate[d] in the conduct giving rise to the discrimination." Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004); see also Stryker, 2020 WL 5127461, at *16. For the reasons explained above, the plaintiff has not shown that Gecht actually participated in the discriminatory conduct against the plaintiff. No evidence suggests that Gecht acted with the intent to discriminate against or harass the plaintiff, nor that Gecht's conduct gave rise to an inference of discrimination. Instead, the record reflects that Gecht reprimanded both Taveras and Maltman for their discriminatory conduct. Thus, although Gecht may be an employer for purposes of direct individual liability, Gecht can still not be held liable for disparate treatment under the NYSHRL or the NYCHRL.[18]

---

[18] The plaintiff's individual claims against Gecht also fail the "more generous NYCHRL standard" because the plaintiff has failed to proffer sufficient evidence showing that Gecht actually discriminated against the plaintiff. See Xiang, 2020 WL 248941, at *7.

Moreover, there is no evidence that Gecht actually participated in the creation of a hostile work environment. Gecht did not make discriminatory comments toward the plaintiff or in the plaintiff's presence, and there is evidence that, when discriminatory comments were made in Gecht's presence, he reprimanded the person who made them. See Defs.' 56.1 ¶ 34. Accordingly, there is no evidence that Gecht actually participated in the creation of a hostile work environment, and Gecht cannot be held individually liable under the NYSHRL or the NYCHRL for this claim.

### Conclusion

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendants' motion for summary judgment is **granted in part and denied in part.** The defendants' motion for summary judgment is **granted** with respect to the ADA claims against the defendants, the retaliation claims against the defendants, and the NYSHRL and NYCHRL claims against Gecht only. The motion is

**denied** in all other respects. The Clerk is directed to close all

pending motions.

SO ORDERED.

Dated:      New York, New York
            September 8, 2022

                                        John G. Koeltl
                                  United States District Judge